UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANSISCO GARCIA TAMAYO and
NORBERT FARCIERT,                                        14 Civ. 09633 (GBD)

                              Plaintiffs,

            -against-

DHR RESTAURANT CO., LLC, d/b/a RARE
BAR & GRILL, RARE CHELSEA
RESTAURANT GROUP LLC, and
DOUGLAS BOXER,

                              Defendants.

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DAVIS & GILBERT LLP**

Guy R. Cohen
1740 Broadway
New York, New York  10019
(212) 468-4800

*Attorneys for Defendants*
*DHR Restaurant Co., LLC.,*
*Rare Chelsea Restaurant Group LLC, and*
*Douglas Boxer*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................2

ARGUMENT ..........................................................................................................11

   I.   THE SUMMARY JUDGMENT STANDARD................................................11

   II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
       PLAINTIFFS' OVERTIME CLAIMS BECAUSE BOTH FARCIERT AND
       GARCIA WERE EXEMPT EXECUTIVE EMPLOYEES ...........................12

       1.   Plaintiffs Were Compensated on a Salary Basis Well in Excess of $543.75
           per Week ...................................................................................13

       2.   Plaintiffs' Primary Duty Was Management ...........................................13

       3.   Plaintiffs Customarily and Regularly Directed the Work of Two or More
           Kitchen Employees ....................................................................22

       4.   Plaintiffs Had Authority to Hire or Fire Other Employees and/or Their
           Recommendations Were Given Particular Weight..................................22

       5.   Plaintiffs Customarily and Regularly Exercised Discretionary Powers .................24

   III.   PLAINTIFFS ARE NOT ENTITLED TO "SPREAD-OF-HOURS"
       COMPENSATION OR PAY STATEMENTS REFLECTING OVERTIME
       HOURS WORKED....................................................................................25

CONCLUSION........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amnesty Am. v. Town of W. Hartford,*
   288 F.3d 467 (2d Cir. 2002) ............................................................. 12

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ......................................................................... 11

*Baldwin v. Trailer Inns, Inc.,*
   266 F.3d 1104 (9th Cir. 2001) ......................................................... 21

*Carreras v. Thierry's, Inc.,*
   No. 14-21188-Civ, 2015 U.S. Dist. LEXIS 81173 (S.D. Fla. June 23, 2015)................. 13, 20

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ......................................................................... 11

*Clougher v. Home Depot U.S.A., Inc.,*
   No. 06-cv-05474, 2010 U.S. Dist. LEXIS 117090 (E.D.N.Y. Nov. 3, 2010) ........................ 24

*Coberly v. Christus Health,*
   829 F. Supp. 2d 521 (N.D. Tex. 2011)............................................... 18

*Donovan v. Burger King Corp.,*
   675 F.2d 516 (2d Cir. 1982) ............................................................. 20

*Downes v. JP Morgan Chase & Co.,*
   No. 03 Civ. 8991, 2007 U.S. Dist. LEXIS 36677 (S.D.N.Y. May 16, 2007)........................ 12

*Gellhaus v. Wal-Mart Stores, Inc.,*
   769 F. Supp. 2d 1071 (E.D. Tex. Mar. 10, 2011) ............................... 23

*Gordon v. Rite Aid Corp.,*
   No. 09 Civ. 7665, 2012 U.S. Dist. LEXIS 54071 (S.D.N.Y. Mar. 9, 2012) ........................ 22

*Icicle Seafoods, Inc. v. Worthington,*
   475 U.S. 709 (1986) ......................................................................... 12

*Kahn v. Superior Chicken & Ribs, Inc.,*
   331 F. Supp. 2d 115 (E.D.N.Y. 2004)......................................... 21, 24

*Moore v. Tractor Supply Co.,*
   352 F. Supp. 2d 1268 (S.D. Fla. 2004)............................................. 21

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ...................................................................................12

*Ramos v. Baldor Specialty Foods, Inc.*,
    687 F.3d 554 (2d Cir. 2012) ...................................................................................12

*Reiseck v. Universal Commc'ns of Miami, Inc.*,
    591 F.3d 101 (2d Cir. 2010) ...................................................................................12

*Scherer v. Compass Grp. U.S.*,
    340 F. Supp. 2d 942 (W.D. Wis. 2004)...........................................................14, 20

*Scott v. SSP Am., Inc.*,
    No. 09-CV-4399, 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29, 2011).............14, 19, 20

*Wright v. Monroe Cnty., N.Y.*,
    No. 05-CV-6268T, 2007 U.S. Dist. LEXIS 35143 (W.D.N.Y. May 10, 2007) ....................22

**Statutes**

29 U.S.C. § 213(a)(1) ...........................................................................................................12

N.Y. Lab. Law § 195(3) .......................................................................................................25

**Other Authorities**

29 C.F.R. § 541.100 ........................................................................................................12, 13

29 C.F.R. § 541.100(a)(1) ....................................................................................................13

29 C.F.R. § 541.100(a)(2) ....................................................................................................13

29 C.F.R. § 541.100(a)(3) ....................................................................................................22

29 C.F.R. § 541.100(a)(4) ....................................................................................................22

29 C.F.R. § 541.106(a) .........................................................................................................14

29 C.F.R. § 541.700(a) ............................................................................................14, 19, 21

29 C.F.R. § 541.700(c) .........................................................................................................14

29 C.F.R. § 541.701 .............................................................................................................22

12 N.Y.C.R.R. § 142-2.4 ......................................................................................................25

12 N.Y.C.R.R. § 142-2.14(c)(4) ..........................................................................................13

12 N.Y.C.R.R. § 142-2.14(c)(4)(i)........................................................................................13

12 N.Y.C.R.R. § 142-2.14(c)(4)(i)(d) ............................................................................................24

Fed. R. Civ. P. 56(c)............................................................................................................................11

Defendants DHR Restaurant Co., LLC ("DHR"), Rare Chelsea Restaurant Group LLC ("RCRG"), and Douglas Boxer submit this memorandum of law in support of their motion for summary judgment dismissing the Amended Complaint of plaintiffs Fransisco Garcia Tamayo ("Garcia") and Norberto Farciert pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This action concerns a cynical effort by two Head Chefs to pretend that they were not managers in an effort to extract overtime pay from their former employers.  Defendants operate multifaceted restaurant and catering operations called Rare Bar and Grill ("Rare") in two busy New York City hotels.  Open for business fifteen to seventeen hours a day, Rare provides a large and varied menu of upscale burger and steak plates to patrons of its expansive, lobby-level restaurants, while simultaneously offering a different menu in the rooftop bar of one location and providing room service to hotel guests and take-out at both, and food deliveries to local residents at Rare Chelsea.  At the same time, Rare caters hundreds of events every year in the hotels' banquet halls, conference rooms and rooftop bars, routinely serving 30-150 guests per event— and sometimes up to 400 guests when multiple events proceed at once—with menus that differ substantially from the restaurant menus and from event to event.

Garcia and Farciert were the Head Chefs who managed and supervised all aspects of the day-to-day food operations of Rare's bustling kitchens.  Yet despite their managerial status, Plaintiffs have nevertheless brought claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") seeking overtime pay for hours worked in excess of 40 per week.  But both the FLSA and the NYLL exempt from overtime employees who work in a *bona fide* executive capacity, and Rare properly classified Plaintiffs—salaried employees who earned around 50% more than other kitchen employees—as exempt.

Indeed, the undisputed facts show that, as Head Chefs of their respective operations, Plaintiffs meet the applicable standards for the executive exemption.  Their primary and most important duty was to manage their respective kitchens, a multi-pronged role that required strong supervisory skills and the regular exercise of discretion in order to juggle all of the varied demands associated with an active restaurant, catering, room service, take-out and (for Rare Chelsea) food delivery operation.  Plaintiffs also customarily and regularly supervised the work of fifteen or more employees as they managed all of the sous chefs, "prep cooks," line cooks, salad preparers, dishwashers and porters whose various shifts in the kitchen began at 6:00 a.m. or earlier and ended as late as midnight.  Moreover, Plaintiffs had authority to hire or fire other employees—and repeatedly exercised that authority—and their suggestions and recommendations concerning personnel matters, such as promotions and raises, were given particular weight by Edgar Hernandez, Rare's Executive Chef, who had overall supervisory responsibility for the food operations at both Rare locations.

Accordingly, and for the reasons set forth below, summary judgment should be granted, and Plaintiffs' FLSA and NYLL claims—as well as their "spread of hours" and pay statement claims—should be dismissed with prejudice.

## STATEMENT OF FACTS

### Background

There are two "Rare Bar and Grills" located in Manhattan: one owned by DHR and located in the Affinia Shelburne Hotel at 303 Lexington Avenue ("Rare Lexington"), and the other owned by RCRG and located in the Hilton Hotel at 152 West 26th Street.  (*See* Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SF") ¶¶ 1, 2.) Rare Lexington and Rare Chelsea have been operating since 2003 and April 2010, respectively. (SF ¶¶ 1, 2.)  Douglas Boxer manages all operations of both Rare Lexington and Rare Chelsea.

(SF ¶ 3.)  He has final supervisory authority over both the "front of the house," which includes the house managers, servers, bussers, runners and bartenders for both the restaurant and catering operations, and the "back of the house," which includes everyone who works in the kitchen and participates in properly preparing the food that supports the restaurant and catering operations (the "Kitchen").  (SF ¶ 3.)  Edgar Hernandez is the Executive Chef of both Rare Lexington and Rare Chelsea.  (SF ¶ 4.)  Hernandez reports to Boxer and he manages and has overall responsibility for the Kitchens at both locations.  (SF ¶ 106.)

**Farciert and Garcia Were the Head Chefs of Their Kitchens**

At each Rare location, the Head Chef is second-in-command of the Kitchen, reporting only to Hernandez.  (SF ¶¶ 5, 6.)  From July 2009 to June 2011, Farciert was Rare Lexington's Head Chef, earning a weekly salary of $1,269, which when annualized amounts to about $66,000.  (SF ¶¶ 5, 25.)  From April 2010 (when Rare Chelsea first opened) to February 2012, Garcia was Rare Chelsea's Head Chef, with a weekly salary of $1,086 and annualized base pay of about $56,500.  (SF ¶¶ 6, 26.)  The Head Chefs managed the day-to-day operations of their respective Kitchens.  (SF ¶¶ 5, 6.)

**The Restaurants' Long Hours, Diverse Menus and Varied Operations**

Rare Lexington and Rare Chelsea both have busy restaurant operations ("Restaurants"), as well as thriving catering businesses ("Catering").  (SF ¶ 7.)  Because they are situated in busy New York City hotels, the Restaurants are open up to seventeen hours a day, serving breakfast, lunch and dinner, seven days a week, in their main lobby-level dining areas.  (SF ¶¶ 7, 8.)  Rare Lexington's main dining room seats up to 111 patrons; Rare Chelsea's seats 160.  (SF ¶¶ 10, 11.)  The menus for the main dining areas contain a variety of main courses, appetizers and side dishes, but Rare specializes in upscale burger and steak plates, such as filet mignon burgers,

3

lobster burgers, cowboy ribeye steaks and New York strip steaks.  (SF ¶ 9.)  Rare offers 15-17 varieties of burgers.  (SF ¶ 35.)

The Restaurant at Rare Chelsea also provides food on the roof deck atop the hotel.  (SF ¶ 13.)  The menu for the rooftop bar differs substantially from the main menu and consists of smaller plates like sliders, ribeye nachos and lollipop wings.  (SF ¶ 13.)  In addition, both Restaurants provide room service to hotel guests fifteen to seventeen hours a day, seven days a week.  (SF ¶ 12.)  Both Restaurants also fill take-out orders, and Rare Chelsea makes deliveries in its area.  (SF ¶¶ 3, 7.)

**Rare Caters Hundreds of Events Every Year**

Separate from the Restaurant, Rare's Catering operations account for a significant amount of business for both Rare Lexington and Rare Chelsea.  (SF ¶ 15.)  Rare uses the rooftop bars, along with conference rooms and banquet spaces in the hotels, for private catered events or meetings ("Events").  (SF ¶¶ 15, 16.)  The Events include smaller, private parties, such as bachelor parties or birthday parties; larger events, such as corporate holiday parties; individualized events, such as providing multiple meals to sports teams competing at Madison Square Garden; and corporate conferences, involving lighter lunch fare, such as salads and sandwiches.  (SF ¶ 16.)

Event menus are almost always very different from the Restaurant menus and from one Event to another.  (SF ¶ 17.)  Depending on the size of the Event, Rare Lexington and Rare Chelsea provide food for 10 to 250 guests, with Events providing food for 30 to 150 guests being more common.  (SF ¶ 17.)  In addition, both locations sometimes provide food for as many as _400_ guests simultaneously during busy days when Events proceed simultaneously downstairs in the banquet halls and upstairs on the roof deck.  (SF ¶ 17.)

From April 2009 to July 2011, Rare Lexington catered more than *800* Events.  (SF ¶ 18).

From January 2011 to February 2012, Rare Chelsea catered more than *450* Events.  (SF ¶ 19.)

**The Head Chefs Supervised Many Kitchen Employees**
**And Earned Significantly More Than Those They Managed**

In order to support their diverse operations, both Rare Lexington and Rare Chelsea have a large number of Kitchen employees.  From 2009 to 2011, Farciert supervised, on average, about fifteen full-time Kitchen employees.  (SF ¶ 20.)  From 2010 to 2012, Garcia supervised, on average, about fifteen to eighteen full-time employees.  (SF ¶ 20.)  Shifts began at 6:00 a.m. or earlier and ran until midnight.  (SF ¶ 21.)

The Head Chefs supervised all the Kitchen employees: a sous chef, who was a line cook who supervised the Kitchen when neither the Executive Chef nor the Head Chef were present; line cooks who worked the grill; line cooks who worked the sauté station; salad preparers; and prep cooks (who butchered meat, prepared burger patties, chopped vegetables, and otherwise prepared the ingredients for the various dishes).  (SF ¶ 22.)  The Head Chefs also supervised porters, who cleaned the Kitchen, and dishwashers.  (SF ¶ 22.)

Farciert and Garcia—with annual salaries of $66,000 and $56,500, respectively—earned substantially more than other Kitchen employees.  (SF ¶¶ 25, 26.)  Kitchen employees at Rare Lexington typically worked 48-hour weeks, were paid between $8 and $14.50 per hour, and earned (including applicable overtime) $22,000 to $42,000 annually.  (SF ¶ 23.)  Similarly, Kitchen employees at Rare Chelsea typically were paid from $8 to $13.25 per hour, and received (with overtime) about $22,000 to $39,000.  (SF ¶ 24.)

**The Head Chefs' Primary Duty Was Management of the Kitchen**

Farciert and Garcia were primarily responsible for managing and supervising all aspects of the day-to-day operations of their Kitchens, including both Restaurant and Catering

operations.  (SF ¶ 27.)  They were required to supervise and otherwise handle many managerial tasks, which included: (a) procuring food and managing inventory; (b) prepping food in advance of each day's Restaurant and Catering operations; (c) preparing food and managing work flow during meal service hours for Restaurant and Catering; (d) ensuring proper presentation of buffets at Catering Events; (e) maintaining a clean Kitchen that met or exceeded applicable health standards; (f) managing all Kitchen workers; (g) ensuring that room service, take-out and (for Rare Chelsea) delivery orders were expedited and presented according to hotel brand standards; and (h) managing weekly scheduling and staffing.  (SF ¶ 28.)

## The Head Chefs Procured Food and Managed Inventory

The Head Chefs procured food and managed inventory for the Restaurants at their respective locations.  (SF ¶ 30.)  Both locations use substantial amounts of food and require a continuous supply of fresh food; they spend $12,000 to $22,000 per week on food, and it is critical for supplies for the Restaurants to be monitored and replenished regularly and often daily.  (SF ¶ 29.)  Based on their knowledge of how much of each item is used and how long it remains fresh, the Head Chefs used discretion to determine how often to purchase each item and how much to purchase.  (SF ¶ 30.)  The Head Chefs placed food orders with Restaurant vendors; checked inventory to determine when new supplies for the Restaurant were needed; inspected deliveries to ensure food supplies were delivered on time and in proper amounts, and that the food met Rare's quality standards; and ensured that the food deliveries for the Restaurant were properly stored in the Kitchen.  (SF ¶ 31.)

They also procured food for Catering Events.  As noted, Catering handled hundreds of Events per year and each Event required customized food orders.  (SF ¶ 32.)  Before an Event, the Head Chef met with an Event coordinator to discuss the menu, determine whether the menu

requests could be met, and finalize both the menu and the quantities required.  (SF ¶ 33.)
Thereafter, Farciert and Garcia placed food orders with Catering vendors, inspected deliveries,
and ensured that Rare used food deliveries for the Events for their intended purpose. (SF ¶ 34.)

**The Head Chefs Supervised the Daily Food "Prep"**

Farcient and Garcia also supervised the daily preparation of the items and ingredients that
were later included in the Restaurants' various offerings.  (SF ¶ 35.)  For example, Rare butchers
its own meat and prepares burger patties in fifteen to eighteen different varieties.  (SF ¶ 35.)
Thus, each day, a certain number of burger patties of different types need to be prepared, and
vegetables need to be chopped, and other food items need to be prepped for further use.  (SF
¶ 35.)

Determining the types and quantities of necessary food items to be prepared each day is a
managerial responsibility requiring experience and the exercise of discretion.  (SF ¶ 36.)  Each
evening, the Head Chefs assessed how much of each food item had been used and exercised their
discretion to prepare a "prep list" identifying the items to be prepped the following day.  (SF
¶ 36.)  The next day, the Head Chefs supervised the prep cooks to ensure that they followed the
instructions set forth on the prep list for the Restaurants.  (SF ¶ 37.)  Likewise, before Events,
Farcient and Garcia prepared prep lists, which were separate from those prepared for the
Restaurants.  (SF ¶ 38.)  The Head Chefs then supervised the prep cooks and other Kitchen staff
to ensure that they complied with the instructions contained on the prep lists for the Events.  (SF
¶ 38.)

**The Head Chefs Supervised the Daily Food**
**Preparation and Expediting for the Restaurant**

Farcient and Garcia were also responsible for ensuring that the dishes prepared for the
Restaurant—whether by grill cooks, sauté cooks, salad preparers or others—were executed

consistent with Rare's standards. (SF ¶ 40.) To that end, the Head Chefs supervised all the Kitchen workers, and they controlled and directed workflow in their Kitchens. (SF ¶¶ 42, 43.) If the Kitchen was short-staffed on a given day, they would use their discretion to determine how to address the issue and direct staff accordingly. (SF ¶ 43.) The Head Chefs regularly exercised discretion by directing Kitchen staff to turn to particular orders at particular times. (SF ¶ 44.) In addition, when a dish was not properly prepared, the Head Chefs exercised discretion to have the appropriate Kitchen employee re-do or correct the order. (SF ¶ 41.)

The Head Chefs also served as "expediters" who monitored each order, tracked how quickly it was prepared, inspected the dish upon completion, and addressed any issues that arose either regarding preparation time or quality. (SF ¶ 45.) As expediters, Farciert and Garcia also liaised with front-of-the-house managers to resolve customer complaints or concerns, which sometimes involved directing a line cook to re-do an order or move it up in the queue. (SF ¶ 46.)

**The Head Chefs Supervised the Daily Food**
**Preparation and Presentation for Catering Events**

Similarly, Farciert and Garcia supervised the day-to-day preparation of dishes for up to 250 guests for each Catering Event. (SF ¶ 47.) Just as with food preparation for the Restaurant, the Head Chefs: (a) ensured that dishes prepared for Events conformed to Rare's recipes and standards; (b) supervised the work of Kitchen employees who prepared food for Events; and (c) controlled and directed workflow relating to Catering. (SF ¶ 48.) Generally, Farciert and Garcia needed to be present and available during Events to supervise the food presentation and delivery, and to work with Event staff to ensure customer satisfaction with the quality and presentation of the food and the timeliness of its delivery. (SF ¶¶ 49, 50.)

**The Head Chefs were Responsible for Maintaining a Clean Kitchen**

The Head Chefs were responsible for maintaining a clean and up-to-code Kitchen, which was and remains a high priority for Rare.   (SF ¶ 53.)   Their responsibilities included: (a) supervising the dishwashers to ensure that they washed and kept all cooking items clean; (b) supervising the cooks and salad preparers to ensure that they maintained clean workstations and otherwise prepared food hygienically; and (c) supervising the porters and cleaning personnel to ensure that they kept the entire Kitchen clean.   (SF ¶ 54.)   Farciert and Garcia were responsible for ensuring that their Kitchens met all requirements of the New York City Department of Health ("DOH"), and, if present when DOH appeared for an inspection, they were required to accompany DOH personnel and demonstrate the Kitchen's compliance with applicable health codes.   (SF ¶¶ 55, 56.)

**The Head Chefs Interviewed, Selected, Hired and Fired Kitchen Employees**

Both Farciert and Garcia had authority to hire Kitchen employees without seeking or obtaining Hernandez's approval.   (SF ¶¶ 57, 67.)   Farciert interviewed, selected and hired, among others, the following Kitchen employees: Gil Merino, Cesar Cruz, Fidencio Cuapio, Rodolfo Pena Martinez, Rubin Pena, Anselmo Farciert, Obet Ramirez, Benito Garcia.   (SF ¶¶ 58, 60-66.)   Although Farciert claims that Hernandez approved certain of these hires, Farciert's deposition testimony confirms that, in many cases, Hernandez never met with or spoke to the employees until after they had already begun working for Rare Lexington.   (SF ¶ 59-66.) Likewise, Garcia interviewed, selected and hired the following individuals (among others) without seeking or obtaining Hernandez's approval: Edgar Diaz, Miguel Xon Tecum, Leonides Perez, Margarito Romero, Alfonso Chino, Roberto Chino, Jorge Pinto, Javier Golvez, Santiago Jiminez and Fidel Manzano.   (SF ¶¶ 68, 70-72.)   Indeed, Diaz, Xon Tecum and Perez have

submitted declarations stating that Garcia hired them and that they started working for Rare Chelsea before they first met with or spoke to Hernandez.  (Declaration of Edgar Diaz, dated May 9, 2016 ("Diaz Decl."), ¶¶ 1-3; Declaration of Leonides Perez, dated May 9, 2016 ("Perez Decl."), ¶¶ 1-4; Declaration of Miguel Xon Tecum, dated May 9, 2016 ("Xon Tecum Decl."), ¶¶ 1-4.)

Farciert and Garcia also had authority to fire Kitchen employees.  Farciert fired Obet Ramirez.  (SF ¶¶ 77-81.)  Garcia fired Roldan Minchaca.  (SF ¶¶ 82-85.)

**The Head Chefs' Recommendations Concerning**
**Raises and Promotions Were Given Great Weight**

Although Farciert and Garcia did not have authority to grant raises themselves, Hernandez relied on and gave substantial weight to their recommendations in determining whether to grant raises to Kitchen staff.  (SF ¶ 74.)  Hernandez did so because the Head Chefs were the day-to-day supervisors who were most familiar with the work performance of Kitchen employees.  (SF ¶ 74.)  Farciert twice recommended to Hernandez that Benito Garcia, a Kitchen employee, receive raises because he performed well and increased his level of responsibility.  (SF ¶ 75.)  Hernandez relied on Farciert's recommendations and twice gave Garcia raises.  (SF ¶ 75.)  Similarly, Garcia recommended that Xon Tecum receive a raise and a promotion from dishwasher to salad preparer.  (SF ¶ 76.)  Hernandez relied on Garcia's recommendations and Xon Tecum received both a raise and a promotion.  (SF ¶ 76.)

**The Head Chefs Managed All of the Kitchen Employees**

As discussed above, the Head Chefs managed all of the Kitchen employees.  The Head Chefs were responsible for ensuring that new employees received proper training, learned how to prepare dishes according to Rare's recipes and standards, and otherwise learned how to do their jobs properly.  (SF ¶ 93.)  Diaz and Xon Tecum stated in their declarations that Garcia trained

them after hiring them.  (Diaz Decl. ¶¶ 2, 4; Xon Tecum Decl. ¶¶ 2, 5.)  In addition to directing the Kitchen employees' work on a daily basis, the Head Chefs were responsible for managing most matters relating to their employment.  (SF ¶ 91.)  Farciert and Garcia set the weekly work schedules for the Kitchen and used their discretion to adjust schedules when necessary.  (SF ¶¶ 94, 96.)  The Head Chefs also used their discretion to handle any day-to-day questions, issues or requests raised by Kitchen employees, such as requests for days off, requests for promotions or requests for raises.  (SF ¶ 92.)  The Head Chefs used their discretion to assign tasks to Kitchen staff; to give them breaks during work hours; and to work extra hours when necessary.  (SF ¶ 94.)  They also heard and, when possible, resolved any employee complaints or grievances, and had authority to issue performance warnings or discipline employees when appropriate.  (SF ¶¶ 92, 95.)

## ARGUMENT

## I.     THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where "the pleadings, the discovery . . . [and] affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To carry its initial burden, the moving party must show that there is the absence of a genuine issue of material fact or that "there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A moving party need only show the absence of proof of any of the essential elements of the non-movant's case.  *Id.* at 323.  Once a properly supported motion for summary judgment has been made, the non-moving party must proffer admissible evidence demonstrating that a trial is required because disputed issues of material facts exist.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  When evaluating a motion for summary judgment, the Court does not have "an obligation . . . to perform an independent review

of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  Applying this standard to the undisputed facts, summary judgment should be granted in Defendants' favor.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' OVERTIME CLAIMS BECAUSE BOTH FARCIERT AND GARCIA WERE EXEMPT EXECUTIVE EMPLOYEES

Summary judgment in Defendants' favor is warranted because there is no genuine issue of fact regarding Plaintiffs' status as exempt executive employees.  The FLSA exempts from overtime those employees working in a "bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1).  Whether an individual employee falls within the executive exemption is a mixed question of law and fact that depends on the actual job characteristics and duties of the employee.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010).  The ultimate issue of whether an employee is exempt is a question of law for the Court to resolve.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Downes v. JP Morgan Chase & Co.,* No. 03 Civ. 8991, 2007 U.S. Dist. LEXIS 36677, at *33 (S.D.N.Y. May 16, 2007).

The U.S. Department of Labor ("DOL") has promulgated regulations defining the FLSA's executive exemption, *see* 29 C.F.R. § 541.100 *et seq.*, and courts generally defer to those regulations.  *See, e.g., Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 560-61 (2d Cir. 2012).  In addition, the executive exemption under the NYLL parallels that of the FLSA, and courts regularly consult the DOL's FLSA regulations when evaluating the applicability of the executive exemption under New York law.  *See, e.g., Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 105 (2d Cir. 2010).

Under the DOL regulations, Plaintiffs meet the executive exemption because: (1) they were compensated on a salary basis of at least $455 per week; (2) their primary duty was management of their respective Kitchens; (3) they customarily and regularly directed the work of

two or more other employees; and (4) they had the authority to hire or fire other employees or their suggestions and recommendations concerning personnel matters were given particular weight.  *See* 29 C.F.R. § 541.100.  Plaintiffs also meet the slightly different standards under the NYLL and its regulations.  *See* 12 N.Y.C.R.R. § 142-2.14(c)(4)(i).

### 1.    *Plaintiffs Were Compensated on a Salary Basis Well in Excess of $543.75 per Week*

Plaintiffs meet the first requirement of the executive exemption under the FLSA because they received a salary exceeding $455 per week during the relevant period: 2009-2012.  29 C.F.R. § 541.100(a)(1).  Plaintiffs likewise satisfy the NYLL salary basis test because their respective salaries exceeded $543.75 per week during the relevant period.  12 N.Y.C.R.R. § 142-2.14(c)(4).  Farciert's gross salary was $1,269 per week; Garcia's was $1,086 per week.  Plaintiffs also received their predetermined salaries on a constant, regular basis, which did not fluctuate based on the quality or the quantity of work they performed.  Accordingly, Plaintiffs' salaries satisfy the first prong of the test for both the federal and state executive exemptions.

### 2.    *Plaintiffs' Primary Duty Was Management*

There is no material dispute that Plaintiffs' primary duty was management of their respective Kitchens and Kitchen staff.   The executive exemption may be satisfied if an employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof."  29 C.F.R. § 541.100(a)(2).  An employee heads a "customarily recognized department of subdivision" of an enterprise if he is "in charge of and ha[s] as his primary duty the management of a recognized unit which has a continuing function."  *Id.* § 541.104(a).  The Kitchens of Rare Lexington and Rare Chelsea are each a recognized department or subdivision of their respective restaurants.  *See, e.g.*, *Carreras v. Thierry's, Inc.*, No. 14-21188-Civ, 2015 U.S. Dist. LEXIS 81173, at *8 (S.D. Fla. June 23,

2015) (stating that plaintiff "was hired as chef de cuisine for the kitchen, clearly a recognized department or subdivision of" the defendant catering business); *see also Scherer v. Compass Grp. U.S.*, 340 F. Supp. 2d 942, 950-52 (W.D. Wis. 2004).

DOL's regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine whether a plaintiff's performance of management activities constitutes his or her primary duty, courts consider "the character of an employee's job as a whole," which includes the following factors:

> the relative importance of the exempt duties as compared with other types of duties, the amount of time spent performing exempt work, the employee's relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*; *see also id.* § 541.700(c).

An employee's time spent performing nonexempt work is not dispositive "when non-management duties are performed simultaneous to the supervision of employees . . . and other factors support a finding that the employee's primary duty is managerial." *Scott v. SSP Am., Inc.*, No. 09-CV-4399, 2011 U.S. Dist. LEXIS 32819, at *33 (E.D.N.Y. Mar. 29, 2011). Furthermore, "[e]xempt executives [generally] make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work," whereas "a nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined periods." 29 C.F.R. § 541.106(a).

According to DOL's regulations, "management" duties include:

- Activities such as interviewing, selecting, training employees;
- Directing the work of employees;
- Maintaining production or sales records for use in supervision or control;

- Appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status;
- Handling employee complaints and grievances;
- Disciplining employees;
- Planning the work;
- Determining the techniques to be used;
- Apportioning the work among the employees;
- Controlling the flow and distribution of materials or merchandise and supplies;
- Providing for the safety and security of the employees or the property.

*Id.* § 541.102.

There can be no material dispute that each Plaintiff's primary duty was managing the Kitchen at his respective location. As Head Chefs, Farciert at Rare Lexington and Garcia at Rare Chelsea were primarily responsible for supervising and managing all aspects of the day-to-day operations of their respective Kitchens, which, as discussed, are complicated, bustling, multi-faceted operations. Each Kitchen serves both a Restaurant and a Catering business. Each Restaurant serves breakfast, lunch and dinner every day in their main dining areas; provides room service to hotel guests; and fills take-out orders. The menu on Rare Chelsea's rooftop bar differs substantially from the dining room's menu, and Rare Chelsea also makes local deliveries. The Catering business handles hundreds of Events every year, with individual menus for each Event. The Catering menus differ substantially from the Restaurant menus, and from one Event to another depending on the size and type of Event.

The Head Chef's job—unquestionably his most critical and important duty—is to make sure that all aspects of the Kitchen run smoothly, efficiently and effectively. A line cook's job is to cook. The salad preparer makes salads. Dishwashers wash dishes and help keep the Kitchen clean. But the Head Chef's job is to make sure the *whole* Kitchen—the whole hectic operation—operates properly, seventeen hours a day, seven days a week, for both Restaurant and Catering activities. To manage the Kitchen, the Head Chefs make sure that food supplies are properly

ordered, delivered and stored; that the food is prepped as required each day; that the dishes are prepared on schedule and meet the high quality standards of both Rare and the hotels in which Rare is situated; and that both Restaurant and Catering patrons are satisfied with both the food and the service. Managing the Kitchen is the Head Chef's most important responsibility because it goes without saying that if the Kitchen does not run smoothly and efficiently, the Restaurant and Catering businesses will not succeed. And the Head Chefs have overall responsibility for the success or failure of the business operation under their management regardless of whether, at any given moment, they are placing food orders with vendors; supervising the prep cooks; interviewing job applicants; working the grill; expediting orders; overseeing the presentation of food at the buffets; or otherwise doing what is necessary to make the Kitchen—and therefore the enterprise—succeed.

Moreover, Plaintiffs' primary responsibilities are classic management duties: planning the work; directing the work; apportioning the work; controlling the flow of work; and supervising the Kitchen at all stages. As managers, Plaintiffs made sure that all of the food for the Restaurant and Catering operations was ordered and available on a daily basis so the work of the Kitchen could proceed. As managers, Plaintiffs determined in advance how much food needed to be prepped for the next day's Restaurant meals and Catering Events. As managers, Plaintiffs supervised the prep cooks to make sure that proper amounts of meat were butchered; that proper numbers of burger patties were prepared; that all of the necessary ingredients were ready for the day's food preparation. As managers, Plaintiffs supervised the preparation of the meals to make sure they met both Rare's and the hotels' standards. As managers, they played traffic cop, serving as "expediters" to ensure that meals were prepared promptly and liaising with front-of-the-house managers to ensure customer satisfaction. They supervised the preparation,

delivery and presentation of Catering buffets and interacted with Event coordinators to ensure customer satisfaction.  They managed room service orders and ensured that those orders were expedited and delivered in compliance with hotel brand standards.  They managed Kitchen employees to ensure that the Kitchen was clean and hygienic and complied with all health codes.

Farciert and Garcia also managed virtually all aspects of the employment relationship with the Kitchen staff—which on average consisted of fifteen to eighteen employees.  They interviewed, selected and hired employees.  They were responsible for training employees.  They supervised the day-to-day work of all the Kitchen employees—the sous chef, the line cooks who worked the grill station and the sauté station, the salad preparers, the prep cooks, the dishwashers and porters.  They ensured that the prep cooks readied the ingredients for the day's offerings.  They supervised the line cooks and salad preparers in their preparation of dishes ordered from multiple menus.  They directed the work of all Kitchen staff, letting them know what needed to be done at any given time.  They set and adjusted work schedules.  They fielded requests for days off and requests for raises and promotions.  They assigned tasks to Kitchen employees; gave them breaks during work hours; assigned them to work extra hours from time to time.  They heard and addressed complaints and had authority to issue performance warnings or discipline employees.  They made recommendations for raises and promotions.  And they fired employees when necessary.  These are classic management functions.

Other factors confirm that Farciert and Garcia were exempt managers.  As Head Chefs, they used their discretion to set their own work schedules and did not clock in and out like the other Kitchen employees were required to.  (SF ¶ 89, 87.)  They used their discretion to decide when to perform each of their various supervisory and managerial tasks and when to perform nonexempt tasks (nonexempt when considered in isolation).  (SF ¶ 90.)  And, along with the

Executive Chef, they were the only members of the Kitchen staff who (a) had monthly in-person management meetings with Boxer to address important business issues; and (b) had access to and used for business purposes a managerial office with a desk.  (SF ¶¶ 86, 88.)

In short, Farciert and Garcia were managers in every respect, as confirmed by those they supervised.  For instance, Manual Asitimbay, formerly a sous chef at Rare Lexington, has a close relationship with Farciert: Farciert brought him on as a plaintiff in this lawsuit (his claim has been settled) and helped Asitimbay find a job after he left Rare.  (SF ¶¶ 97-99.)  Notwithstanding his relationship with Farciert, Asitimbay candidly acknowledged that Farciert was supervisor of Asitimbay and everyone else who worked in the Kitchen.  (SF ¶ 100.)  Consequently, according to Asitimbay, Farciert oversaw everything that went on in the Kitchen; got involved in all aspects of food preparation; and directed staff to handle assignments as he deemed necessary and appropriate.  (SF ¶¶101, 102.)  Likewise, Edgar Diaz, Miguel Xon Tecum and Leonides Perez, Kitchen workers at Rare Chelsea, have stated in declarations that Garcia was their supervisor and that Garcia was also the supervisor of everybody that worked in the Kitchen.  (Diaz Decl. ¶¶ 4, 5; Perez Decl. ¶ 5; Xon Tecum Decl. ¶¶ 5, 6.)

Farciert and Garcia's managerial responsibilities are similar in many ways to those of the plaintiff in *Coberly v. Christus Health*, 829 F. Supp. 2d 521 (N.D. Tex. 2011).  In that case, the district court held that the plaintiff—the "Senior Chef" in the kitchen of a dining services department—was an exempt executive employee because the defendants presented evidence showing that the plaintiff "was responsible for managing the kitchen" and was also responsible for "procuring food supplies . . . , directing and supervising the operation of the kitchen production staff and work flow of the kitchen personnel, overseeing the food service workers, [and] interviewing and recommending the hiring of food service workers."  *Id.* at 529-30.

Defendants have introduced similar undisputed evidence here concerning Farciert and Garcia's supervisory responsibilities as the Head Chefs of their respective Kitchens.

Plaintiffs may attempt to minimize their managerial responsibilities by emphasizing that they reported to Hernandez, the Executive Chef.  But Hernandez split his time between Rare Lexington and Rare Chelsea; he had a number of responsibilities that differed from Plaintiffs'; his work was often done away from the Kitchen; and there was ample managerial work to be handled by more than one person.  (SF ¶ 109, 110, 113, 114.)  Hernandez was physically present in the Kitchen with Farciert (or Garcia) less than half of his workweek, and even when physically present, Farciert and Garcia continued to manage their respective Kitchens.  (SF ¶¶ 109, 115, 116, 118.)  Accordingly, the Head Chefs had a great deal of "freedom from direct supervision."  29 C.F.R. § 541.700(a).

To be sure, both Farciert and Garcia sometimes themselves prepared food in their respective Kitchens.  In both cases, however, Farciert and Garcia spent far more than 50% of their time performing the managerial duties described above.  As DOL's regulations state, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  *Id.* § 541.700(b).  But as the regulations make clear, even if Plaintiffs spent more than 50% of their time cooking or otherwise performing nonexempt duties, they may still be exempt employees due to the importance of their managerial roles.  *See id.* § 541.700(b) & (c).

Case law supports this conclusion as well.  For instance, in *Scott v. SSP Am., Inc.*, No. 09-CV-4399, 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29, 2011), the defendant, a Unit Manager for food and beverage outlets at JFK International Airport, testified that she spent 90% of her time performing nonexempt duties.  The district court nonetheless held that the plaintiff

was an exempt employee, observing that she "continued to supervise employees while she performed nonexempt work." *Id.* at *35. Likewise, in *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982), the Second Circuit held that assistant managers at a fast food chain were exempt employees even though they spent part of their time performing the same duties as hourly, line employees. The Second Circuit supported its holding by noting that the assistant managers' managerial functions were essential to the operation of the restaurants, and that they could perform their oversight responsibilities "simultaneously with the performance of non-exempt work." *Id.* at 521.

Similarly, here, even when Farciert and Garcia were cooking, they were still in their respective Kitchens, in close contact with and supervising Kitchen staff, monitoring the Kitchens' efficiency, ensuring the quality of the Kitchens' output, and available to handle customer complaints or other issues as they arose. (SF ¶ 91.) Thus, the fact that Plaintiffs spent part of their time actually preparing food does nothing to diminish the importance—and predominance—of their managerial roles. *See Diaz v. Team Oney*, Inc., 291 F. App'x 947, 949 (11th Cir. 2008) (holding that plaintiff assistant manager at two Papa John's pizza restaurants was exempt employee where plaintiff's "managerial duties . . . were significantly more important to the operation of the restaurant than his non-managerial tasks"); *Carreras*, 2015 U.S. Dist. LEXIS 81173, at *9-11 (holding that plaintiff chef de cuisine was exempt employee despite spending 90 percent of her time cooking, and stating that "it makes perfect sense that a supervisor of cooks should spend the majority of her time working alongside the cooks"); *Scherer*, 340 F. Supp. at 952 (holding that plaintiff executive chef in university's catering department was exempt employee despite spending 75% of his time engaged in food preparation,

and observing that plaintiff "monitored the performance of other staff working in the kitchen during the time he spent preparing food").

Finally, the Head Chefs' status as executive employees is supported by the fact that they earned significantly more than other members of the Kitchen staff.  With annual compensation of $66,000, Farciert earned more than 50% more than the highest paid Kitchen employees at Rare Lexington (who earned $42,000) and more than twice as much as other staff members. Similarly, with annual compensation of $56,500, Garcia earned almost 50% more than the highest paid Kitchen employees at Rare Chelsea (who earned $39,000) and more than twice as much as other staff members.  This large gap is itself evidence supporting the conclusion that Plaintiffs are exempt managerial employees.  *See* 29 C.F.R. § 541.700(a) (stating that a factor to consider when determining the primary duty of an employee is the "relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee"); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) (stating that "[t]he relationship between the [plaintiffs'] salary and the wages paid to the assistant managers supports an exemption" where the plaintiffs' salaries of $2,400 per month was at least $500 or $250 more per month than assistant managers' base salaries); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1278 (S.D. Fla. 2004).

Taken together, the undisputed evidence shows that the primary duty of both Farciert and Garcia was management, and that they had extensive supervisory responsibilities covering nearly every aspect of their respective Kitchens.  Accordingly, there is no material issue of fact as to this element of the executive exemption.  *See Kahn v. Superior Chicken & Ribs, Inc.,* 331 F. Supp. 2d 115, 119-20 (E.D.N.Y. 2004) (granting summary judgment for employer where evidence showed that plaintiff's duties were executive in nature).

### 3. Plaintiffs Customarily and Regularly Directed the Work of Two or More Kitchen Employees

No genuine issue of material fact exists as to whether Plaintiffs customarily supervised the work of at least two or more employees in the Rare Chelsea and Rare Lexington Kitchens. An employee directs the work of other employees "customarily and regularly" if the "frequency [is] greater than occasional," but it may also be "less than constant." 29 C.F.R. § 541.701; *see also Gordon v. Rite Aid Corp.*, No. 09 Civ. 7665, 2012 U.S. Dist. LEXIS 54071, at *33 (S.D.N.Y. Mar. 9, 2012) (citing 29 C.F.R. § 541.100(a)(3)).

As discussed at length above, Plaintiffs customarily and regularly supervised the work of far more than two employees; indeed, Plaintiffs supervised on a daily basis fifteen or more employees, including sous chefs, line cooks, salad preparers, dishwashers and porters. Accordingly, there is no material factual dispute that Plaintiffs regularly and customarily directed the work of at least two full-time employees. *Wright v. Monroe Cnty., N.Y.*, No. 05-CV-6268T, 2007 U.S. Dist. LEXIS 35143, at *11-12 (W.D.N.Y. May 10, 2007) (holding that "[r]egardless of [plaintiff's] characterization" of his position as "a mid-level management position" the facts showed that he regularly supervised at least two employees and met the executive exemption).

### 4. Plaintiffs Had Authority to Hire or Fire Other Employees and/or Their Recommendations Were Given Particular Weight

Finally, Plaintiffs meet the fourth prong of the DOL analysis, which provides that, in order to be considered an exempt executive, an employee must have "the authority to hire or fire employees" *or* must have his or her "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [be] given particular weight." 29 C.F.R. § 541.100(a)(4). The regulations note that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level

manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* § 541.105.

Here, Plaintiffs meet the exemption because they had the authority to hire and fire employees, *and* their suggestions and recommendations on status changes of employees were given particular weight. As discussed above, both Farciert and Garcia hired many employees. The undisputed facts demonstrate that Farciert hired, among others, Gil Merino, Cesar Cruz, Fidencio Cuapio, Rodolfo Pena Martinez, Rubin Pena, Anselmo Farciert, Obet Ramirez and Benito Garcia. The undisputed facts also demonstrate that Garcia hired, among others, Edgar Diaz, Miguel Xon Tecum, Leonides Perez, Margarito Romero, Alfonso Chino, Roberto Chino, Jorge Pinto, Javier Golvez, Santiago Jiminez and Fidel Manzano. They also had authority to fire employees. Farciert fired Obet Ramirez, and Garcia fired Roldan Minchaca.

Furthermore, although Farciert and Garcia did not have authority to grant raises themselves, Hernandez relied on and gave particular weight to their recommendations in determining whether to grant raises and promotions to Kitchen staff because the Head Chefs were the day-to-day supervisors who were most familiar with the work performance of the various employees in their Kitchens. Hernandez relied on Farciert's recommendations in giving two raises to Benito Garcia. Hernandez relied on Garcia's recommendations in promoting Miguel Xon Tecum from dishwasher to salad preparer and granting him a raise.

Courts have held that this exemption applies where a plaintiff's authority over hiring and firing decisions was far less significant than the Head Chefs' here. *See*, *e.g.*, *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D. Tex. Mar. 10, 2011) (finding that plaintiff's suggestions regarding hiring, firing and change of employee status, such as performance reviews, were given particular weight where "some of [plaintiff's] recommendations regarding hiring and

changes in employee status were followed, as several of her subordinates received pay raises based in part on [plaintiff's] review of their performance"); *Kahn,* 331 F. Supp. 2d at 120 (holding that executive exemption applied to a restaurant employee who was consulted on hiring and firing decisions).   Thus, these undisputed facts show that Plaintiffs were exempt under the executive exemption.

### 5.   Plaintiffs Customarily and Regularly Exercised Discretionary Powers

Defendants are entitled to summary judgment on Plaintiffs' claims under the FLSA as they have satisfied the relevant test under the executive exemption.   They have also satisfied the NYLL's additional element for the executive exemption, which requires that plaintiffs customarily and regularly exercised discretionary powers.   12 N.Y.C.R.R. § 142-2.14(c)(4)(i)(d); *see also Clougher v. Home Depot U.S.A., Inc.*, No. 06-cv-05474, 2010 U.S. Dist. LEXIS 117090, at *10 (E.D.N.Y. Nov. 3, 2010).   Plaintiffs regularly exercised their discretionary powers in the performance of all of their duties.   Plaintiffs hired employees as they saw fit, gave employees time off when they deemed it appropriate, and made recommendations for raises and promotions using their discretion.   They supervised all aspects of the Kitchen, directing the work of Kitchen staff as they deemed appropriate, ordering food based on their independent determinations as to how much was needed, and using their discretion to expedite orders as appropriate.   In addition, each evening Farciert and Garcia assessed how much of each food item had been used and prepared a "prep list" identifying all the items that needed to be prepped for the next day, and they used their discretion to determine the amounts that needed to be prepared.   And Farciert and Garcia also regularly exercised discretion by directing Kitchen staff to turn to particular orders at particular times.   Plaintiffs both did all of this and more free from immediate and direct

supervision from Hernandez.  Thus, the undisputed facts show that both Farciert and Garcia met this additional requirement for exemption under the NYLL.

## III.  PLAINTIFFS ARE NOT ENTITLED TO "SPREAD-OF-HOURS" COMPENSATION OR PAY STATEMENTS REFLECTING OVERTIME HOURS WORKED

Because Plaintiffs are executives exempt from overtime under the NYLL, they are not entitled to "spread-of-hours" compensation or pay stubs reflecting overtime hours worked.  New York Department of Labor regulations require that an "employee" receive one additional hour's pay for any day in which "the spread of hours exceeds 10 hours."  12 N.Y.C.R.R. § 142-2.4.  But those regulations define "employee" to exclude "any individual permitted to work in . . . [an] [e]xecutive . . . capacity" and then go on to define "executive" using the multi-pronged test discussed in detail above.  *Id.* § 142-2.14(c)(4)(i).  Likewise, section 195 of the NYLL requires employers to provide pay statements that include "the number of overtime hours worked," but only for "employees who are not exempt from overtime compensation" under the applicable regulations.  N.Y. Lab. Law § 195(3).  Because Plaintiffs are exempt executives, Defendants are entitled to summary judgment dismissing Plaintiffs' Third and Fourth causes of action concerning spread-of-hours compensation and pay stubs.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted, and the Amended Complaint should be dismissed in its entirety, with prejudice.

Dated:  May 9, 2016
       New York, New York

**DAVIS & GILBERT LLP**

By:   */s/ Guy R. Cohen*
     Guy R. Cohen

1740 Broadway
New York, New York  10019
gcohen@dglaw.com
(212) 468-4800

*Attorneys for Defendants*
*DHR Restaurant Co., LLC,*
*Rare Chelsea Restaurant Group LLC, and*
*Douglas Boxer*