G965vidA                        argument

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    FRANCISCO GARCIA TAMAYO, et
     al.,
4
                    Plaintiffs,              New York, N.Y.
5
               v.                            14 Civ. 9633 (GBD)
6
     DHR RESTAURANT CO., LLC, et
7    al.,

8                   Defendants.

9    ------------------------------x

10                                           SEPTEMBER 6, 2016
                                             11:25 a.m.
11
     Before:
12
                         HON. GEORGE B. DANIELS,
13
                                             District Judge
14

15                            APPEARANCES

16

17   JOSEPH & NORINSBERG, LLC
          Attorneys for Plaintiffs
18   BY:  JON L. NORINSBERG
          BENNITTA L. JOSEPH
19        CHAYA M. GOURARIE

20   DAVIS & GILBERT, LLP
          Attorneys for Defendants
21   BY:  GUY R. COHEN

22

23

24

25
```

G965vidA                              argument

1           (Case called)

2           MR. NORINSBERG:  Jon Norinsberg on behalf of

3     plaintiffs from Joseph & Norinsberg.  Good morning, your Honor.

4           MS. GOURARIE:  Chaya Gourarie on behalf of the

5     plaintiffs from Joseph & Norinsberg.

6           MS. JOSEPH:  Bennitta Joseph on behalf of plaintiffs

7     from Joseph & Norinsberg.  Good morning, your Honor.

8           MR. COHEN:  Guy Cohen, Davis & Gilbert, on behalf of

9     the defendants.

10          THE COURT:  Good morning, Mr. Cohen.

11          MR. COHEN:  Good morning.

12          THE COURT:  Mr. Cohen, let me hear you with regard to

13    your motion.

14          MR. COHEN:  Thank you, your Honor.

15          Your Honor, as set forth in detail in defendant's

16    summary judgment motion, Rare runs a bustling, hectic

17    restaurant and catering operation, operates 17 hours a day at

18    two very busy New York City hotels.  The plaintiffs served as

19    the head chefs of these restaurants and they managed all

20    aspects of the day-to-day operations of the kitchens that they

21    oversaw on a day-to-day basis.  As I will lay out in greater

22    detail and as set forth in the papers, they were managerial

23    employees and as a result they are exempt from the overtime

24    provisions of both the Fair Labor Standards Act and the New

25    York Labor Law under the executive exemption.

1          There are four provisions, four prongs to the

2     executive exemption that Rare is required to establish but only

3     two of them are at issue here so I will turn to them actually

4     for convenience in reverse order, and the first one relates to

5     employment decisions.

6          Under the executive exemption, the fourth prong

7     requires Rare, the defendant, to establish either that the

8     plaintiffs -- the head chefs -- had the authority to hire or

9     fire employees or that their suggestions and recommendations as

10    to hiring, firing, advancement, promotion or any other change

11    of status of other employees is given particular weight.

12    That's the language of the provisions.  And the law is crystal

13    clear that suggestions can be deemed or considered to have been

14    given particular weight even if there is a higher authority,

15    higher supervisor that has to approve them.  And so, it is our

16    position, it is Rare's position that these head chefs in fact

17    had the authority to hire and fire.  However, that's not

18    necessary to be established for purposes of this motion.  All

19    that's necessary to establish is that their suggestions were

20    given particular weight.  And the undisputed evidence

21    establishes, at a bare minimum, that the executive chef gave

22    particular weight to their suggestions.  And that's not just

23    about hiring, it could be about any of them.  It's not just

24    hiring, it's not just promotions, it is not just raises, it is

25    not just terminations, but he gave particular weight to each

1    and every one of those and I think it is most clearly shown

2    through the procedures that were in place and that are not in

3    dispute with respect to hiring.

4              Mr. Farciert was the head chef at the Rare Lexington

5    location and he testified and it is not in dispute that there

6    was a procedure in place and that procedure, which was used in

7    a number of instances all of which are in the record and not

8    disputed, the procedure was as follows:  He would find out who

9    a potential candidate was.  He would meet with that potential

10   candidate.  He would determine if that potential candidate was

11   proper for whatever position they were hiring for be it working

12   the grill, making the salads, washing the dishes, and then at

13   some point he would call the head chef, the executive chef --

14   excuse me, Mr. Hernandez -- and say to the executive chef here

15   is the person who is being brought in.  That person would then

16   start working at Rare without ever having even met

17   Mr. Hernandez.

18             Now, there is in fact a dispute between the parties as

19   to whether Mr. Hernandez played any role in the hiring of these

20   individuals.  We would say that in fact Mr. Farciert was just

21   giving Mr. Hernandez a heads up as to who he hired but, in any

22   event, at a bare minimum, it was clear that these individuals

23   were hired and if Mr. Hernandez consented to the hiring of

24   these individuals, it is undisputed that he did so based solely

25   on the recommendations of Mr. Farciert, and therefore

1   Mr. Farciert's suggestions were given particular weight.

2   Precisely or almost precisely the same situation applies at

3   Rare Chelsea where there was testimony both from Mr. Hernandez,

4   the executive chef, as well as testimony from three specific

5   individuals, all of whom said the same thing:  They came in,

6   they had an interview with Mr. Garcia who was the head chef at

7   that location.  Mr. Garcia spoke to them, they had a

8   conversation, Mr. Garcia then offered them a job.  They came in

9   and began working at Rare Chelsea and they began doing that

10  without Mr. Hernandez having ever met these individuals.

11          Under those circumstances, again, we would say that

12  Mr. Hernandez didn't hire them but if he consented to it there

13  is no question and the undisputed facts show that he had to

14  have relied upon or given weight to their suggestions because

15  he never even met the individuals and was going on the

16  determinations that they made as to whether they were

17  appropriate hires.

18          It is also the case that Mr. -- that their

19  recommendations with respect to raises and promotions were

20  relied on by Mr. Hernandez.  Mr. Hernandez has stated and there

21  is no testimony rebutting his statement that he relied on the

22  recommendations of Mr. Garcia and upon Mr. Farciert for

23  promotions and raises for a simple reason:  They were the

24  day-to-day head chefs who had most knowledge about the

25  performance of the individuals in their respective kitchens.

G965vidA                           argument

1    And the testimony is undisputed, not a single word to the

2    contrary, that Mr. Farciert twice recommended that a Benito

3    Garcia -- to my knowledge no relation to the plaintiff

4    Garcia -- on two different occasions a recommendation was made

5    that he should receive a promotion and that he should receive a

6    raise and on both occasions he received a promotion and he

7    received a raise.  Entirely undisputed.

8           Similarly, with Mr. Garcia at Rare Chelsea, the

9    evidence in the record entirely undisputed that he felt an

10   individual named Tecum, who had come to work there I believe

11   initially as a dishwasher was doing a very good job, he

12   believed that he should be promoted, he believed that he

13   deserved a raise.  He made that recommendation to Mr. Hernandez

14   and the individual received a raise.  Again, no testimony in

15   the record contradicting any of that.

16          And then, turning to terminations, to sort of close

17   out the loop, there was a termination of an individual named

18   Minchaka.  Mr. Garcia addressed the view that Mr. Minchaka was

19   arriving late too often, that at times when he arrived he even

20   arrived drunk at some point in time, and that as a result it

21   was interfering with the functioning of the restaurant,

22   particularly the morning shift which Mr. Minchaka worked and he

23   recommended that Mr. Minchaka be terminated and Mr. Minchaka

24   was terminated.  And although in his declaration there is a

25   suggestion that he made no such recommendation, we have cited

G965vidA                        argument

1   to the deposition testimony that very clearly states that he

2   recommended that this individual be terminated.

3          And finally, as to terminations with respect to

4   Mr. Farciert, it is also the case that Mr. Hernandez relied on

5   his recommendations.  There was an individual, again a morning

6   person -- sorry, a cook who worked in the morning.  A

7   recommendation was made that he be terminated for similar

8   reasons:  For lateness, for not arriving on time on a regular

9   basis, and disrupting the activities of the restaurant.

10          There is a complaint throughout the papers submitted

11   by the other side that Mr. Hernandez didn't immediately

12   terminate this person and that was what apparently or what is

13   stated that Mr. Farciert wanted to do but, in fact, if you read

14   carefully the testimony or what is stated by each person, it is

15   in fact undisputed that the recommendation was made by

16   Mr. Farciert that this individual be terminated, that there was

17   an agreement, a discussion that he should be given additional

18   opportunity to do better; in addition, in the interim they

19   should try to find a replacement for him, and that within two

20   months of that those corrections did not occur and that, in

21   response to an additional discussion regarding termination,

22   Mr. Hernandez gave authority to Mr. Farciert to terminate

23   Mr. Ramirez.

24          That's a long story but at the end of the day what it

25   shows is that with respect to all of these various decisions,

 1    whether with respect to hiring, with respect to firing, all of

 2    them -- and it could be just one, the opinions, the discussions

 3    suggestions and recommendations -- these individuals were given

 4    particular weight and there is in fact no evidence in the

 5    record to the contrary.

 6         Turning from that question, your Honor, to the second

 7    issue here and the second issue here is whether these

 8    individuals, whether their primary duty was management and in

 9    addressing the question of whether the primary duty was

10    management, as an initial matter this Court need look no

11    further than the 56.1 statement that defendants submitted in

12    this case, paragraphs 27 and 118.

13         In those paragraphs the statement was made by the

14    defendants that the primary duty of these individuals was

15    supervising and managing their respective kitchens and, of

16    course, there is citations to the record, there is citation to

17    evidence to support those statements, and one would anticipate

18    or expect that in a case of this sort involving a chef it would

19    be -- pardon me use of a non-legal phrase -- a no-brainer that

20    they would deny that allegation, that they would cite to

21    admissible evidence, and they would state that, as is often the

22    case in this type of case, that cooking was the chef's primary

23    duties, that they were just perhaps cooks with fancy titles but

24    they make no such assertion, your Honor.  And, in fact, they

25    don't put in any evidence at all of any kind in response.  They

G965vidA                          argument

1    simply make what we believe is a baseless objection that

2    somehow making a factual assertion about what a person's

3    primary duty is is improper.  But, of course, that is not the

4    case, it is a very simple matter for a person to say, no,

5    that's not my primary duty, this is my primary duty.  They

6    chose not to put in any evidence in response to that.  That

7    factually supported statement is in the 56.1 statement and

8    therefore that constitutes an admission that this Court can

9    rely on.

10        But it is not just an admission that this Court can

11   rely on, not just some attorney error, there is a reason that

12   they didn't make that statement, that they didn't make that

13   allegation, that they didn't put in evidence, and the reason

14   they didn't is because there is clear evidence in the record,

15   both from Mr. Garcia and Mr. Hernandez, that their primary duty

16   was in fact managing and supervising.

17        Mr. Garcia, himself, testified that when

18   Mr. Hernandez, the executive chef was not present, which the

19   evidence in the record establishes was 60 percent or more of

20   his working hours, that his primary duty was in fact

21   supervising and managing the kitchen on an overall basis.  And

22   Mr. Farciert, himself, testified that his primary or main

23   responsibility was to be the person in charge, the person who

24   made sure, on an overall basis, that the kitchen ran properly

25   and to do whatever was needed to be done in order to ensure

G965vidA                        argument

 1    that the kitchen was running properly.  These are classic

 2    management functions that were acknowledged and conceded in the

 3    depositions of these individuals.

 4            And although they both argue or try to argue that when

 5    Mr. Hernandez was there they were not supervisors, in fact, if

 6    you look a little more carefully at their testimony, they say

 7    that they basically had the exact same functions when he wasn't

 8    there, the only difference being that when Mr. Hernandez was

 9    there, they didn't supervise as much because there was another

10    person there who could also supervise.  But, the fact that

11    there was periodically a more senior supervisor present does

12    not change the nature of their responsibilities.  And I will

13    note that throughout their responses the plaintiffs have, on

14    many occasions, not responded factually to assertions that were

15    supported in defendant's papers and another example of that was

16    we put in specifically, in paragraphs 115 to 117, the

17    allegation that their duties were the same when Mr. Hernandez

18    was there, the only difference being that you could ask a

19    question to Mr. Hernandez, there was another supervisor

20    present.  But they didn't put in any factual evidence to

21    counter that.  The only thing, the only evidence they put in

22    was a piece of evidence that Mr. Hernandez said, well, when I'm

23    there, when I'm in the building, I will walk around and I will

24    make sure everything is okay.  The presence of another

25    supervisor there does not change their management

G965vidA                      argument

1    responsibilities or their duties and responsibilities.

2            Their duties and responsibilities or their managerial

3    status is also confirmed by unrebutted testimony from their

4    co-workers.  We have submitted evidence from four co-workers,

5    one of whom was a plaintiff in this case and is a friend of one

6    of the plaintiffs and three of whom work at the other location,

7    and all four of them have testified without being rebutted in

8    any fashion that it was their belief, it was their

9    understanding that these individuals were their managers, that

10   they worked in the kitchen as cooks, as dishwashers, and that

11   these were their managers and there, moreover, these

12   individuals managed everybody in the department.  And so if

13   they needed a day off, if they wanted to ask for a raise, if

14   they had a work-related question, they were directed to

15   Mr. Garcia or to Mr. Farciert and that is entirely unrebutted.

16   In fact, in their responsive papers the plaintiffs, rather than

17   factually responding, as they did not on numerous occasions,

18   they merely state that the testimony of these individuals is

19   irrelevant.  Well, it is not irrelevant and in fact case law

20   demonstrates that it is highly relevant how these individuals

21   are viewed by other staff members.

22            Your Honor, their status as managers, that is the fact

23   that their primary duty, their most important duty was

24   management, is really encapsulated well by the number of

25   admissions that they have made concerning the nature of Rare's

1    operations.  It is undisputed that this does not -- these are

2    substantial operations.  They run 17 hours a day, there is

3    catering, there is catering on the roof deck, there is catering

4    in the hotel rooms, banquet halls and conference halls. there

5    is additional service done on the rooftops.  These are large

6    restaurants and all of this work, often that the events have as

7    many as 150, 200 people and they -- the plaintiffs do not

8    dispute any of this.  They acknowledge that Rare is a

9    significant, substantial operation and that in order to manage

10   it you need to have an individual who is working and who is

11   juggling all of the day-to-day responsibilities of such a

12   large, complex, hectic operation and it is not in dispute that

13   their duties and responsibilities, as the head chefs included

14   during the inventory and making sure that everything was

15   purchased on a regular basis.  No small matter for a company of

16   Rare's volume where they've purchased $10,000 to $20,000 worth

17   of food a week and they have to continually -- the job of the

18   manager is to go through, to see what is spoiled, to see what

19   is not spoiled and make sure everything is there, to prep all

20   of the items on a day-to-day basis that need to be -- that need

21   to be cooked and used for the catering operations and

22   restaurant operations of the day, to juggle which particular

23   item is done at which particular time and in that regard they

24   serve the head chefs, as expediters, and in their papers they

25   try to make it sound like, well, what is an expediter?  You

1    just do the orders in the order in which they're received but

2    that is a mischaracterization and an inaccurate

3    characterization.  An expediter, which is undisputed that they

4    do, their job is to use their discretion, day in and day out.

5    If you have a large party, if you have a number -- if somebody

6    orders appetizers, what do you put on when?  Do you start by

7    putting on the appetizers?  You want to make sure everything

8    comes out at the same time.  You want to make sure that while

9    you are working through this busy operation that you are not

10   setting aside or not failing to do all of the catering work

11   that needs to be done concurrently.  They have to make sure

12   that all of the takeout orders are done and expedited in the

13   right fashion, that if a person comes in and doesn't like a

14   particular order that it is redone.

15          All of these -- all of these different activities are

16   activities that they do on a day-to-day basis, they require the

17   routine exercise of discretion, and because of the size of the

18   operation it really shows that this case is far different from

19   some of the cases that are cited

20          This is not the corner pub where the cook just said,

21   hey, I'm back there flipping burgers.  It is simply not the

22   case.  Nor is this the type of case where a person can say,

23   well, I didn't have any managerial authority.  They acknowledge

24   that they do.

25          Turning a little more to their specific functions,

G965vidA                          argument

 1   none of which are in dispute in the record --

 2           THE COURT:  I am going to have to limit your time to

 3   another few minutes because I am going to have to leave at

 4   about noon so I want to give them an opportunity.

 5           MR. COHEN:  I will move it quickly.

 6           They handle all sorts of classic management functions,

 7   the ones I have already described.

 8           THE COURT:  I have read all of that.

 9           MR. COHEN:  In addition to all of those, they were

10   ensuring that all the training was done, they would provide

11   performance reports to Mr. Hernandez, they would work days off

12   or days on on a particular day.  So, all of that are classic

13   management functions.  And then we turn to supervision of

14   employees.

15           They supervise not one, not two, not three, 15 to 18

16   employees on a regular basis.  Not in dispute, your Honor.  The

17   person working the grill, the person working the sautee, the

18   potatoes, all of those different jobs, the job of the head chef

19   was to supervise them.  The chef was required to get all the

20   inventory.  All of these things being put together.

21           And so, when you ask yourself what is the most

22   important function, most primary function of management, well,

23   you would ask yourself, well, what else was it?  Was it

24   cooking?  Because there is no allegation that they were cooking

25   most of the time.  In fact, there is not an allegation that

G965vidA                    argument

they were cooking, say, 25 to 30 percent of the time or less

and in the case of Mr. Farciert it appears that he wasn't even

cooking even more than a day a week, even according to his own

testimony.

          So, let me just stress a few of the points that were

made by the other side.  There is a new argument made out of

nowhere.  As the Court can imagine, when you take a deposition

you want to find out what somebody's duties and

responsibilities were and Mr. Farciert was clearly asked the

question:  Did your duties and responsibilities ever change?

And he said no.  And I said, just to be clear, to the best of

your recollection you had the same job, same duty throughout

your time at the company?  Yes, absolutely.  The rest of the

deposition is addressing all of those supervisor functions.

          Well, now with a little bit of fear about summary

judgment, suddenly Mr. Farciert submits an affidavit where he

said, oh wait, changed my mind.  For the first year I was

working there I was just a sous chef, I was just getting

trained to be a cook.  Completely out of the blue, completely

contradicts his testimony, and of course case law is clear that

on summary judgment he can't submit an affidavit that

contradicts your deposition testimony.  And in that he tries to

say, well, I cook six hours, eight hours a day.  And that's a

completely new testimony, completely revised testimony.

          Similarly, in a further effort to, I would say, to try

G965vidA                        argument

       to salvage Mr. Farciert's case, they have submitted an

       affidavit from a Mr. Velez, and in that affidavit Mr. Velez

       says, well, I saw him working eight hours a week for the first

       year that I was there.

              Well, we were very clear -- Mr. Norinsberg and I in

       fact had a very good relationship throughout this case -- and

       they handed us initial disclosures:  Identify a number of

       people.  And I made very clear it was my intention to depose

       anybody on that list that they intended to put in testimony

       from.  And, in fact, Mr. Norinsberg and I had a discussion in

       which he specifically said, okay, I'm not going to use this

       guy, I'm not going to use that guy but I do intend to use that

       guy.  And I deposed the exact guys that he said he was going to

       use.  So, we always had a very good relationship and that

       hasn't changed but I will say that that affidavit is entirely

       inappropriate and should be barred because the witness was not

       identified during discovery, not identified in their initial

       disclosures.

              A few additional points.

              An argument is made that they haven't shown how much

       time, or we haven't shown how much time the plaintiffs spent on

       management.  Well, it is not so.  The argument and the position

       is that they were spending 90 percent or more of their time on

       management because if they were working on a grill or they're

       working doing anything else, they're still supervising at the

G965vidA                          argument

1    same time.  And they don't dispute that.  They don't dispute

2    the many cases that say that you can in fact be exempt even if

3    you are performing certain non-exempt functions like cooking

4    and supervising at the same time.  Instead they say, well,

5    there were times when I was working really hard, it was so busy

6    I worked from 8:00 to 12:00 and so busy I didn't have time to

7    do anything else.

8              Well, the question is not whether you had time to do

9    it, it is a question of what your responsibilities are.  And

10   so, a perfect example is Mr. Garcia, who testified that he had

11   to cover for a cook from 8:00 to 12:00 in the morning and it

12   was very, very busy.  Well, that might be true but it doesn't

13   change that his responsibilities, which are undisputed at the

14   very same time in the morning, what happens?  He is supervising

15   the prep people who are making the patties, who are cutting the

16   vegetables, he is supervising the intake of everything that

17   comes in during the day.  And there is no dispute that those

18   were still his management responsibilities while he was doing

19   the cooking.

20             And in that way, your Honor, this case is very

21   different from some of the other cases to which they cite

22   because in some cases, the testimony of the individual is that

23   I was a cook, I didn't have any managerial responsibilities, or

24   in one case the woman testified when I was working making the

25   sandwiches, all I was doing was working making the sandwiches.

G965vidA                    argument

1   I had no other duties and responsibilities.  That is not their

2   testimony and that is not the fact of it.  The fact is whenever

3   they were working and whenever they were cooking, which was not

4   a significant percentage of the time from what we can gather

5   and was in the record, they were still supervising at the same

6   time and they have not challenged that at all.

7          Finally, they repeat a mantra over and over again.  I

8   didn't have any independent authority, I had to run everything

9   by Mr. Hernandez, but it is stated in these broad general

10  abstract terms and that when you actually delve into the record

11  itself what you see is that they did have authority, they

12  exercised discretion in innumerable ways from directing

13  individuals to work on a particular assignment, tell the grill

14  guy to go make a salad because we're busy.  Tell somebody to

15  make a cheese plate because we have to send it upstairs.

16         The fact is everybody in that kitchen had particular

17  jobs so when you boil that all together, your Honor, you have

18  to ask yourself the question:  What was the most important role

19  of these individuals?  What was their primary role?  And they

20  haven't said what it is.  They certainly haven't put in any

21  evidence of it and it certainly wasn't -- cooking, there is a

22  lot of people doing the cooking, and it wasn't washing the

23  dishes, there is people who wash the dishes.  But there is only

24  one person who was a hundred percent there a hundred percent of

25  the day at these two locations whose job was to make sure that

G965vidA                    argument

1   all of the differing and disparate pieces of an admittedly,

2   concededly, bustling, active kitchen are happening and

3   proceeding and getting together at once.  Therefore, your

4   Honor, we believe that the undisputed evidence shows that

5   management was their primary duty and, with that, and with that

6   and with the fourth prong being established, your Honor, we

7   believe based on the undisputed facts that summary judgment

8   should be granted.

9           THE COURT:  Thank you.

10          Mr. Norinsberg?

11          MR. NORINSBERG:  Good morning, your Honor.

12          THE COURT:  Good morning.

13          MR. NORINSBERG:  Your Honor, summary judgment in this

14   case should be denied.  It should be denied because the

15   defendants have failed to meet their burden of proof on summary

16   judgment.  They have failed to prove two essential elements of

17   the executive exemption.  They have failed to prove the primary

18   duty was the plaintiff's management.  And, they failed to prove

19   that hiring and firing was independent authority or that their

20   suggestions were given particular weight.

21          THE COURT:  Let me start backwards because I want to

22   see whether there is really factual dispute as to certain

23   issues.

24          It seems to me from this record -- and if I am

25   misstating it you can correct me -- it seems to me from this

1    record that over the 15 to 18 employees that were at the

2    restaurant when these two individuals were there, that those 15

3    to 18 people reported to the head chef.

4             Is that an incorrect statement?

5             MR. NORINSBERG:  I think in that context that

6    hierarchy is correct but what's missing from that, Judge, is

7    the fuller context that many of the functions that the head

8    chefs were performing were interchangeable functions that a lot

9    of exempt -- a lot of the non-exempt hourly employees were also

10   performing, such as receiving orders.

11            THE COURT:  No, I understand that, but I want to first

12   try to figure out who is in charge.  Okay?  And I think -- I'm

13   not sure that you are arguing that when the two head chefs were

14   at their locations and there were 15 to 18 other employees that

15   they were the individuals who were in charge.  Everybody

16   reported to them, they supervised all of the activities of all

17   of those other employees.

18            Is that inaccurate?

19            MR. NORINSBERG:  I think it is, your Honor.

20            THE COURT:  To what extent is that inaccurate?

21            MR. NORINSBERG:  For example, if Mr. Tamayo is

22   spending four hours in a given day at the sautee station

23   cooking, he specifically testified he is not supervising

24   people.

25            THE COURT:  Who is in charge then?  If somebody had a

G965vidA                           argument

1     problem wouldn't they still have to go to him for a decision?

2              MR. NORINSBERG:  When Edgar Hernandez is on site at

3     both of these --

4              THE COURT:  Again, let's put aside that, putting aside

5     that argument talking about when Hernandez is not on site

6     because Hernandez is clearly in the hierarchy but the two head

7     chefs, Hernandez is the executive chef.

8              MR. NORINSBERG:  Right.

9              THE COURT:  When the executive chef is not present the

10    head chefs are in charge.  Is that an incorrect statement?

11             MR. NORINSBERG:  It's not that I'm saying that it is

12    incorrect, your Honor, I'm just staying that it misses maybe

13    the actual context of what was happening there.

14             THE COURT:  But you are saying that wasn't their

15    primary duty.

16             MR. NORINSBERG:  That's not the primary duty and there

17    is a glaring omission in the summary judgment papers that the

18    defendants made that they just gloss over as they're presenting

19    the oral argument.  One of the most critical factors that has

20    to be shown is what percentage of time is delegated to the

21    managerial responsibilities versus what percentage is delegated

22    to non-managerial.

23             THE COURT:  That's where I want to focus your argument

24    then.

25             MR. NORINSBERG:  Okay.

G965vidA                          argument

1          THE COURT:  Is your argument simply that if they spent

2     a greater percentage of time doing non-managerial work?

3     Because your argument is not that they don't do managerial or

4     supervisory work.

5          MR. NORINSBERG:  That's correct.

6          THE COURT:  So you are saying other than saying that

7     they spent more than 50 percent of their time doing

8     non-managerial work, is there any other argument to be made

9     that they are not the ones in charge making the decisions at

10    their locations where there are head chefs when the executive

11    chef isn't available?

12         MR. NORINSBERG:  If you bring the question like that I

13    have to agree with you on the way you framed it.

14         THE COURT:  That's all I wanted to know.

15         MR. NORINSBERG:  I want to clarify, though, that what

16    defendants do, they list a laundry list of functions that they

17    claim are managerial functions and then they boldly assert in

18    their moving papers that plaintiff clearly spend more than 50

19    percent of their time performing managerial functions or

20    greater and they do not cite to the record.

21         THE COURT:  What do you say they spend over 50 percent

22    of their time doing?  Cooking?

23         MR. NORINSBERG:  Not just cooking, there is training,

24    expediting, receiving orders.

25         THE COURT:  Aren't those managerial responsibilities?

1          MR. NORINSBERG:  No.

2          THE COURT:  Why isn't training managerial?

3          MR. NORINSBERG:  Because testimony in the record shows

4    that training was done by everybody at a cook station to the

5    next person.  Whoever standing at a cook station is training

6    the next guy is not a managerial function; everybody did it,

7    everybody expedited orders, everybody received orders.

8    Everybody -- if there is a complaint, a managing complaint, it

9    went to the front of the house manager.  No matter who it was.

10         THE COURT:  I know, but the person who ultimately had

11   this discretionary decision-making authority with regard to all

12   of those decisions was the head chef, right?

13         MR. NORINSBERG:  I don't agree with that because, for

14   example, if there was a complaint from a customer about a

15   complaint going on in the kitchen, it would be brought to the

16   manager front of the house, not to our guy.

17         THE COURT:  But if the manager and head chef disagree,

18   the head chef's position would control, right?

19         MR. NORINSBERG:  I don't agree because it could be --

20         THE COURT:  Do you say that the employee could make a

21   decision adverse to what the head chef told him to do?

22         MR. NORINSBERG:  No, because he didn't have the

23   authority to begin with.  It would go to Edgar Hernandez.  They

24   couldn't discipline.

25         THE COURT:  Edgar Hernandez, what part of the time are

G965vidA                          argument

you saying Edgar Hernandez was available to make the decisions
for them?

          MR. NORINSBERG:  According to my client's testimony he
was there 90 percent of the time of the first year of the
operation.

          THE COURT:  He couldn't be in two locations 90 percent
of the time.  It is impossible.

          MR. NORINSBERG:  The second location didn't exist in
the first year from 2009 to 2010.

          THE COURT:  So, in the first year, okay, so what
about --

          MR. NORINSBERG:  90 percent of the time.

          THE COURT:  What about after the first near?

          MR. NORINSBERG:  I just want to step back for one
second, your Honor.

          This is what I feel like is being lost in this
discussion here.  They had a burden of proof because they're
the employer.

          THE COURT:  Right.

          MR. NORINSBERG:  They never cited the applicable
standard which is they have to show plainly and unmistakably --
that's an exact quote -- Second Circuit, Supreme Court, they
never cited anywhere in their brief or acknowledged that that's
the actual standard.

          THE COURT:  They do say that.  We are not disputing

G965vidA                          argument

1      the standard.  The standard is whether they make employment

2      decisions or their primary duty was managing.  Those are the

3      two things at issue.

4              MR. NORINSBERG:  But it has to be both plain and

5      unmistakably clear on the record according to the Second

6      Circuit on *Mullins v. City of New York* which cites the Supreme

7      Court.  They never met the burden in the original motion

8      because they never actually showed various factors that the

9      Courts actually look at, not just the relative time which, by

10     the way, Judge, they never spoke about the time until the reply

11     brief and all of a sudden Hernandez, for the first time ever

12     says, oh, they were only cooing 25 to 30 percent of the time.

13     But they're the movant.  At summary judgment they should have

14     cited to the record if there was any record about that.

15             THE COURT:  Okay.  Let's say I will -- and that's

16     where I will look.  I will look and see if the record indicates

17     that more than 50 percent of the time they were engaged in

18     managerial functions rather than functions otherwise.

19             MR. NORINSBERG:  Okay.

20             THE COURT:  But, other than that --

21             MR. NORINSBERG:  There is more.

22             THE COURT:  I know, but other than that, when

23     Hernandez is not around these are the people that everybody

24     else reported to, isn't it?  These two head chefs.  Every

25     reported to the head chef; is that correct?

G965vidA                         argument

1            MR. NORINSBERG:  I guess, Judge, if we were to talk in

2     a theoretical sense --

3            THE COURT:  I'm talking in a real sense.

4            MR. NORINSBERG:  I don't think the actual testimony

5     bears that out.

6            THE COURT:  Who do they report to?

7            MR. NORINSBERG:  They weren't reporting, it is an

8     assembly line of people working.

9            THE COURT:  Who is in charge?

10           MR. NORINSBERG:  There is no one person there.

11           THE COURT:  You are saying to me the head chef does

12    not have the responsibility to tell the other individuals what

13    their job responsibilities are while they're there?

14           MR. NORINSBERG:  I wouldn't go that far.  What I would

15    say is if you actually consider the testimony in the record,

16    they were doing so many -- they, meaning the head chefs -- were

17    doing so many non-managerial functions --

18           THE COURT:  That's the other argument, that's the 50

19    percent argument.  I'm not talking about that.  I am asking you

20    specifically, even if they were spending -- because I want to

21    put that issue aside if I can put it aside.  Even if your

22    argument is that 90 percent of the time they were doing

23    non-managerial functions it is clear that the other period of

24    time, that 10 percent, they were engaged in managerial

25    functions.

G965vidA                          argument

1              MR. NORINSBERG:  I will give you that, your Honor.

2              THE COURT:  And no one else had the authority, no one

3      else on the scene had the authority that the head chefs had

4      above the head chefs or equal to the head chefs other than

5      Hernandez who was the executive chef.

6              Is that an accurate statement?

7              MR. NORINSBERG:  I will give you that too, Judge.

8              THE COURT:  Okay.

9              MR. NORINSBERG:  But the question is, on this record,

10     let's say that.  If they did that 10 percent of the time that

11     was true.  As a matter of law that would blow out their summary

12     judgment motion.

13             THE COURT:  You are saying that was their duty and no

14     one else had that duty above them other than Hernandez and they

15     served that function and there is nobody else who -- when they

16     were on the scene, there was nobody else this record could

17     point to who served the function other than the head chef.

18             MR. NORINSBERG:  I would agree but, keep in mind, even

19     when they're the top person on the scene, even in that

20     scenario, they're implementing and following the express

21     directives of the executive chef.  He had explicit rules, he

22     had procedures.

23             THE COURT:  That's true of any managerial hierarchy.

24     You are subject to the decisions of those who are above you.

25     Isn't that true?  I mean, those people who work for Bill Gates,

G965vidA                        argument

1    just because they're the vice president, they have to do what

2    Bill Gates wants them to do.  That doesn't make them a

3    non-managerial employee.

4              MR. NORINSBERG:  Right, but one of the factors, one of

5    the most important factors on primary duty is whether there is

6    a complete freedom from direct supervision and the defendant

7    failed establish that because the testimony is very clear,

8    there were express directives, there were required procedures,

9    schedules, assembly line, cleaning, all types of things.  These

10   weren't things that our plaintiffs created, these were policies

11   that Hernandez created.

12             THE COURT:  But policies don't matter.  It is not

13   policies, it is who implements those policies on behalf of

14   management, isn't it?  That's really the key.

15             MR. NORINSBERG:  But if we are looking at the way, we

16   are only trying to look at the analysis that we see in the

17   Second Circuit and a lot of the cases defendants cite are out

18   of the Second Circuit.  We are going by this Circuit.  This

19   Circuit says that's an important factor.  Look at what they're

20   actually doing, whether they're actually policy-making or

21   whether they're following directives.

22             THE COURT:  Tell me what it is that you say they could

23   not have the done when they were on the job as head chef unless

24   they picked up the phone and called Hernandez and it was

25   Hernandez made that decision.  Give me an example.

1          MR. NORINSBERG:  They could not discipline somebody.

2     Both plaintiffs testified that if --

3          THE COURT:  Forget about dealing with the employees,

4     the employment decisions.  I'm talking about their primary duty

5     in terms of making sure that the restaurant ran appropriate.

6     Is there any decision that they -- discretionary decision they

7     could not make on their own if they were there and Hernandez

8     wasn't there?  You are not saying they had to call up Hernandez

9     every time they wanted to make a decision?

10         MR. NORINSBERG:  No.  Specifically with firing,

11    absolutely they couldn't do it.  Disciplining absolutely

12    couldn't do.

13         THE COURT:  I'm not talking about employment

14    decisions, I'm talking about primary duty of managing the

15    place.  In terms of primary duty of managing the place.

16         MR. NORINSBERG:  I would agree with you on a

17    day-to-day basis I don't think on every single decision they

18    have to call Hernandez up but they do not --

19         THE COURT:  Tell me what kind of decision, managerial

20    decision other than personnel decision, that they would have to

21    call Hernandez up for.

22         MR. NORINSBERG:  I'm not sure that the record

23    indicates one way or the other whether there were other

24    decisions like that but things they were doing were being done

25    by everyone.  That's our overriding point.

1          THE COURT:  Well, the things they were doing wasn't

2     being done by everyone.  That's not the argument you made.  If

3     they told a person this is your assignment for that day, that's

4     not what everybody, all 15 of the people could make that

5     decision.  That's a management discretionary decision.

6          MR. NORINSBERG:  Right, but --

7          THE COURT:  If the person said I want you to cover

8     these tables, I mean, that's -- I guess that's not a cook, a

9     chef issue.  Maybe it is a chef issue.  But, if the chef says,

10    look.  Today we are going to do X.  I want you to do X.  There

11    is not some other employee there who can override that

12    decision.

13         MR. NORINSBERG:  But, Judge, I understand exactly what

14    you are saying but that almost completely disregards what the

15    burden was on this motion.  It is simply talking about in the

16    abstract, yes, in that context they are a top dog on that but

17    what about their burden on the motion?  They failed on this

18    motion because they haven't met the burden.  They deliberately

19    left out the question -- I will give you an example.  He was

20    questioning Mr. Farciert and he said -- counsel said to

21    Mr. Farciert:  You have cooked less than 50 percent of the

22    time?  And the answer was sometimes yes, sometimes no.  Does he

23    follow up and say well what percentage was sometimes, what

24    percentage not?  Can you tell us for the record?  He never

25    asked the question.

1          They're asking the Court to do the heavy lifting here,

2     take these declarations -- I have never seen so many

3     declarations by parties trying to fill in gaps in evidence and

4     put it on the Court's desk and say, Court, you fill in our lack

5     of proof because we didn't do our job during discovery.

6          THE COURT:  Again, that's as to the percentage of

7     time.  I understand you are saying that part is in dispute.

8          MR. NORINSBERG:  You can blow out the motion just on

9     that, Judge.

10         THE COURT:  I don't understand anything else being in

11    dispute.  I don't understand that they weren't the people in

12    charge when they were there and Hernandez wasn't available or

13    wasn't there.  That they made discretionary decisions at the

14    time, that they exercised managerial -- they were the people

15    that this record indicates exercised managerial responsibility

16    and supervisory responsibility over everyone else there other

17    than Hernandez, right?

18         MR. NORINSBERG:  Fair enough, but another very

19    important factor, critical factor under this Circuit:  What's

20    the relative importance of the managerial function that they're

21    performing versus their non-managerial.

22         THE COURT:  It is very important, they're the head

23    chef.  Everybody is supposed to report to them.

24         MR. NORINSBERG:  No, but the fact is on summary

25    judgment the burden is to show -- and here is what the evidence

1    actually showed -- almost all of the managerial duties that

2    were being performed by the head chef were also being completed

3    by non-exempt employees.

4              THE COURT:  Giving me an example of that.

5              MR. NORINSBERG:  Such as receiving orders, such as

6    expediting orders.

7              THE COURT:  But receiving orders and expediting

8    orders, in and of itself, is not a managerial function.  It is

9    the person who is making the discretionary decisions.  I don't

10   have anything in this record that says that anyone else was in

11   charge, had the ultimate responsibility for those decisions

12   equal to the head chef.  No one else had that.  You can't

13   put -- you would agree -- you would agree -- that the

14   managerial responsibilities that the head chefs had, no one

15   else had that same possibility or greater responsibility when

16   they were at their location serving as the head chef.

17             MR. NORINSBERG:  I would agree, but what tells this

18   Court that the non-managerial functions that these two

19   plaintiffs reporting were performing was less important.  What

20   tells this Court, based on this record, that those managerial

21   functions, in theory, were more important than what they

22   actually did on the frontline every day cooking, training,

23   expediting, receiving orders, just like a whole bunch of

24   non-managerial.  What tells this Court on this record?  They

25   failed in their proof, they didn't make their burden.

G965vidA                          argument

```
1              THE COURT:  I will look at that.  Again, I understand
2    that argument but you keep coming back to the same argument and
3    I have about two minutes, so.  I am going to --
4              MR. NORINSBERG:  I want to quickly segue.
5              THE COURT:  Because the employment decisions -- I will
6    concede to you that they could not -- well, I won't concede
7    that at this point because they argued differently, I have to
8    look at it more carefully -- but, even if I were to concede to
9    you that they didn't, alone, make the hiring and firing
10   decisions, clearly they were the ones in charge of the process.
11   They interviewed the people, they reviewed the applications,
12   they made the decision as to whether or not it would be
13   recommended to the executive chef that a certain person would
14   be hired or a certain person would be fired.
15             That's an accurate statement, right?
16             MR. NORINSBERG:  I could say in a very general sense,
17   yes, but let me just point out a few things, quickly.
18             They have absolutely no records -- defendants have no
19   records of any single employee that was ever hired or fired by
20   either plaintiff.  Now, there were 50 employees, up to 50
21   employees that were fired from the kitchen in the year 2009
22   alone.  There is no records at tall to show that our plaintiffs
23   had anything to do with it.  The two people that were
24   identified --
25             THE COURT:  There is evidence they had something --
```

1   you are talking about hiring and firing, or just firing?

2                MR. NORINSBERG:  Right now I am just talking about the

3   firing.

4                THE COURT:  Didn't they make recommendations as to

5   certain people being fired?

6                MR. NORINSBERG:  Yes, and they were disregarded.

7        I am perplexed by counsel's argument.  He presents it

8   to you as if it is one side.  In reality our plaintiffs

9   vehemently denied it.  They said, listen, I did make a

10  recommendation.  You know what Hernandez said?  Nice.  Thanks a

11  lot.  I will do what I feel like doing.  Thank you.  And that's

12  what he did.  He didn't listen to these guys.

13               THE COURT:  So you say there is nobody who was fired

14  on their recommendation?

15               MR. NORINSBERG:  Not one in the record.  There is two

16  people they cited, both of them we have direct conflicting

17  evidence.  They want this Court to weigh evidence and resolve

18  it on their side because that's the way they want the case to

19  go.

20               THE COURT:  But the executive chef didn't hire anyone

21  other than someone that they interviewed, assessed and

22  recommended be hired, right?

23               MR. NORINSBERG:  I'm sorry, Judge.  I don't think the

24  record supports that at all.

25               THE COURT:  I'm asking.  You know the record better

1    than I.  The record doesn't support that?

2            MR. NORINSBERG:  There is nothing in the record about

3    it.  It came up with eight names after discovery is over to try

4    to suggest these people are people that were hired by Tamayo.

5            THE COURT:  I'm asking whether that's a disputed issue

6    of fact.

7            MR. NORINSBERG:  It is a disputed issue of fact.

8            THE COURT:  And how have you disputed the allegation

9    that the people that were hired or interviewed by your clients

10   and were recommended to be hired to the executive chef?  What

11   dispute is that?  They deny that?

12           MR. NORINSBERG:  We have a declaration from Tamayo.

13   We went point by point with three people they claimed he

14   interviewed and recommended.

15           THE COURT:  Did they deny, under oath, that they were

16   recommending people to be hired and those people were hired?

17           MR. NORINSBERG:  Denied it.

18           THE COURT:  Okay.  I will look at that.

19           MR. NORINSBERG:  Denied it, went point by point.

20           THE COURT:  So are you saying they never made a

21   recommendation with regard to hiring or firing that was

22   followed by the head chef?

23           MR. NORINSBERG:  I'm not going to say that with

24   Farciert and I think there is very limited testimony, but in a

25   vacuum you have to know how many people overall the restaurant

G965vidA                          argument

1    hired.  If 50 people were fired in 2009, logically probably 50

2    people had to be hired.  What percentage of that, what part of

3    his role as a manager was that to actually hire people?  And

4    that's the problem.  Just saying it numerically, he might have

5    been involved with one or two, what does that really tell you

6    as to whether that was an important part of his role in the

7    restaurant.

8              THE COURT:  Thank you.

9              MR. NORINSBERG:  For these reasons, Judge, summary

10   judgment should not be granted.

11             THE COURT:  All right I will have to go back.

12             I will give you 60 seconds because I have a former

13   mayor who is waiting for me downstairs.

14             MR. COHEN:  Very quickly on the employment issues.

15             The point by point that he tries to make about the

16   hiring is completely inaccurate.  The declaration goes through

17   point by point picking and quibbling about certain points.  It

18   does not quibble with the fact that the individuals met with

19   him, he interviewed them, he made a recommendation or didn't

20   and started working before Mr. Hernandez ever saw them in

21   person.  A hundred percent undisputed.

22             The same could be said about the terminations.  They

23   will quibble about details and say they hoped that he would be

24   fired right away, but if you go carefully through the testimony

25   it is very clear that their recommendation was relied upon, in

1    one case perhaps not as quickly as they would have preferred

2    but it was relied upon.

3          And then I will just turn very quickly to the

4    percentage issue and there are two things there.  The first

5    thing is there is that case law is clear that when, as here,

6    the requirement that the person needs to be there as a manager,

7    they're managing regardless of whether they're supervising the

8    prep, whether they're working the grill at that moment.  That's

9    the very nature of being the boss.  You are working one thing

10   or you are working the other.  And so, under those

11   circumstances there is case law that is very clear that the

12   percentage of time actually performing those functions doesn't

13   matter, but we would go further to say that they were spending

14   the 90 percent if not more of their time performing those

15   functions because it is encompassed in the day-to-day work that

16   they do.

17         And then, finally, I would go back to the first point

18   I made which was if they had an argument to be made that these

19   guys were cooks, that that was their primary duty and not

20   management, I guarantee you they would have put something in a

21   declaration saying I was a cook, or I was somebody who was

22   performing non-exempt functions.  In fact, we have listed

23   virtually every function that they performed the great majority

24   of which are management functions and none of them take away

25   from -- and even if some of those are performed by others,

G965vidA                          argument

 1   there is only one person who was in charge who was required to

 2   supervise and to make sure all of it got done and that was the

 3   head chefs.

 4            THE COURT:  Thank you very much.

 5                            oOo

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25