**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FRANCISCO   GARCIA   TAMAYO   and :
NORBERTO FARCIERT,                          :
                        Plaintiffs,              :
            -against-                                :
                                                           :
DHR RESTAURANT CO., LLC, *d/b/a* RARE :
BAR   &   GRILL,   RARE   CHELSEA :
RESTAURANT   GROUP,   and   DOUGLAS :
BOXER,                                               :
                        Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GEORGE B. DANIELS, United States District Judge:

MEMORANDUM DECISION
AND ORDER
14 Civ. 9633 (GBD)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 03 2017

Plaintiffs Francisco Garcia Tamayo and Norberto Farciert bring this action against

Defendants DHR Restaurant Company, LLC (doing business as Rare Bar & Grill), Rare Chelsea

Restaurant Group, and Douglas Boxer for alleged violations of (1) the Fair Labor Standards Act

("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*, (*see* Am Compl., ECF No. 30, ¶¶ 40-43); (2) the

New York Labor Law ("Labor Law" or "N.Y.L.L.") §§ 195, 650 *et seq.*, (*see id.* ¶¶ 44-47, 51-55);

and, (3) the spread of hours requirement pursuant to New York State regulation 12 N.Y.C.R.R. §

142 *et seq.* (*See id.* ¶¶ 48-50.)

Plaintiffs allege that these claims arise out of their employment as Head Chefs at two of

Defendants' New York City restaurants. (*Id.* ¶¶ 25-29, 35-39.) Plaintiffs further allege that they

worked at least seventy-two hours a week, but were not paid overtime wages or spread of hours

by Defendants. (*Id.*) Plaintiffs seek compensatory and punitive damages (plus pre- and post-

judgment interest), injunctive and declaratory relief against Defendants, as well as costs and

disbursements, and other just and proper relief. (*See* Am. Compl., Prayer, ¶¶ 2-12.)

Defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56

on the grounds that Plaintiffs are exempt executive employees under both the FLSA and NYLL,

and therefore not entitled to overtime wages or spread of hours compensation. (*See* Defs.' Mot. for Summ. J., ECF No. 47; Defs.' Mem. of Law in Supp. of Mot. ("Mem."), ECF No. 49, at 12, 25.)

Defendants' motion for summary judgment is DENIED as to Plaintiff Garcia. Based on the record before this Court, there remains a genuine issue of material fact as to whether his primary duties were managerial in nature. Defendants have therefore failed to establish that the FLSA and NYLL executive exemptions apply to him.

Because such issues of material fact do not exist as to Plaintiff Farciert's exempt status, Defendants' motion to dismiss his claims is GRANTED.

## I. FACTUAL BACKGROUND

The following facts are taken from the parties' statements filed pursuant to Local Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), ECF No. 48; Pls.' Resp. to Defs.' Rule 56.1 Statement ("Pls.' 56.1 Stmt."), ECF No. 64); the July 15, 2016 Declarations of Plaintiffs Garcia, ("Garcia Decl.," ECF No. 65), and Farciert, ("Farciert Decl.," ECF No. 66), submitted in support of their Memorandum in Opposition to Summary Judgment; Plaintiffs' deposition testimony (Farciert Dep. Tr. ("Defs.' Farciert Dep."), Ex. 1 of Decl. of Guy Cohen in Supp. of Mot. for Summ. J. ("Cohen Decl."), ECF No. 55-1; Farciert Dep. Tr. ("Pls.' Farciert Dep."), Ex. D of Decl. of Jon Norinsberg in Opp'n to Mot. for Summ. J. ("Norinsberg Decl."), ECF No. 63-1; Garcia Dep. Tr. ("Defs.' Garcia Dep."), Ex. 2 of Cohen Decl., ECF No. 55-2; Garcia Dep. Tr. ("Pls.' Garcia Dep."), Ex. A of Norinsberg Decl., ECF No. 64-4); Declaration of Victor Velez ("Velez Decl.") in Opposition to Motion for Summary Judgment, ECF No. 67; and the deposition testimony of Edgar Hernandez ("Hernandez Dep.") (Ex. C of Norisnbserg Decl., ECF No. 63-3). The facts are undisputed, unless otherwise noted, or taken in the light most favorable to Plaintiff.

Rare Bar and Grill is a New York-based upscale restaurant chain specializing in gourmet hamburgers. (Defs.' 56.1 Stmt. ¶¶ 1-2.) Defendant Douglas Boxer is a managing member and supervisor of both Rare branches with "final supervisory authority over both the 'front of the house' . . . and the 'back of the house[.]'" (*Id.* ¶ 3.) Executive Chef Edgar Hernandez formed the top of the kitchen hierarchy for the company. (*Id.* ¶¶ 4, 106.) Hernandez did not maintain set hours at either Rare branch, instead varying his hours depending on each branch's business need. (*Id.* ¶ 113.) Hernandez also handled Rare's catering operations at various locations outside of the restaurant kitchens. (*Id.* ¶¶ 15-16.)

Plaintiff Garcia worked as Head Chef at Rare Bar and Grill Chelsea ("Rare Chelsea"), which is owned by Defendant Rare Chelsea Restaurant Group, from July 2009 to June 2011. (*Id.* ¶ 5.) Plaintiff Farciert worked as Head Chef at Rare Bar and Grill Lexington ("Rare Lexington"), which is owned by Defendant DHR Restaurant Co., LLC, from April 2010 to February 2012. (*Id.* ¶¶ 1, 6.)

### A. Plaintiff Garcia

Garcia started as a sous chef at Rare Bleecker (now closed), where Hernandez supervised the location approximately two to three hours a day. (Pls.' Garcia Decl., at 26: 11-17.) Around April 2010, when Rare Chelsea opened, Garcia received more responsibilities "in the terms of paying more attention to the food, keeping the restaurant clean, having, the refrigerator organized, and in terms of getting, the service out of the kitchen." (Pls.' Garcia Dep., at 18: 12-15.) Garcia worked about eighty hours each week: Monday through Friday from 9:00 a.m. to 11:00 p.m., and Saturday and Sunday from 6:00 a.m. to 11:00 or 11:30 p.m. (*Id.* at 47:3-6). Even after 2010, when Garcia's title changed to "Head Chef" of Rare Chelsea, Garcia testified that he was "like a sous

chef" because he could not make decisions without consulting or calling Hernandez, (*id*. at 44:4-11), and "continued to clock in just like he did when he was an hourly worker." (Opp'n at 4, 5.)

Garcia testified that "an important part of his job was to manage and supervise all of the individuals in the kitchen to ensure that they carried out their functions in the manner that Mr. Hernandez required," (Pls.' Garcia Dep., at 59:16-21), but only "when Chef Edgar Hernandez was not present." (*Id*. at 67:6-7.)  Garcia's duties included organizing the refrigerator, ensuring that the food was cooked well or according to the restaurant protocol (*see id*. at 58:6-11), and that the restaurant was clean.  (*Id*. at 43: 17-23).

Concurrently, Garcia regularly "worked a cooking position," (*id*. at 67: 17-21), and covered shifts for breakfast, lunch, and/or dinner each day.  (*See id*. at 67:8-68:11.)  Usually, Garcia spent from 6 a.m. to 4 p.m. preparing ingredients and sautéing, "as opposed to doing all the other job responsibilities."[1]  (*Id*.; *id*. at 74:21.)  For example, he spent two hours each morning for a year cooking eggs at the breakfast station when the breakfast cook resigned. (Pls.' Garcia Dep., at 69:2-18.)  When Garcia was cooking, he could only supervise the other kitchen operations "not too well; just by looking."  (*Id*. at 74:23-75:75:2.)

Garcia said his primary responsibilities would shift when Hernandez was present such that Garcia "would pay more attention to [his] station at the moment."  (*Id*. at 67:6-16)  According to Garcia, Hernandez split his time about fifty percent between Chelsea and Lexington, (*id.*, at 36:14-17), but "Hernandez would spend a large portion of his time . . . focused on [the catering side]" as well.  (*Id.*, at 37: 11-14.)

---

[1] Based upon Garcia's testimony, and taking the facts in the light most favorable to Plaintiff, if Garcia was sautéing and doing food prep for about ten hours a day, for seven days a week, he performed this non-exempt work for at least 70 hours of his alleged 80 hour work weeks.

With regard to personnel, Garcia did not make kitchen staff schedules. (*Id.*, at 78:4-79:24.) He occasionally determined how to fill in absentee staff—Hernandez appears to have made the majority of those decisions via phone if he was not onsite. (*See id.*) Garcia also would let Hernandez knew who was doing a good job because, as he testified, "I would spend more time at the restaurant [than Mr. Hernandez], I could see the person who was working." (Defs.' Garcia Dep., at 98:12-23.) Garcia believed it was part of his job responsibilities to provide Hernandez with feedback on the kitchen workers. (*Id.*) For example, Garcia recommended a dishwasher for a pay raise but had no knowledge whether that recommendation affected Hernandez' ultimate decision. (Pls.' Garcia Dep., at 97:20-25.)

While Garcia contends that he never had the independent authority to hire or fire employees, (Garcia Decl., ¶ 18), Garcia recommended that Hernandez hire Edgar Diaz and a Mr. Onesimo for vacant posititons.[2] (Pls.' Garcia Dep., at 82:23-84:23.) Defendants claim that Garcia also hired Miguel Tecum, Leonides Perez, Margarito Romero, Alfonso Chino, Roberto Chino, Jorge Pinto, Javier Golvez, Santiago Jimenez, and Fidel Manzano.[3] (*See* Defs.' 56.1 Stmt. ¶¶ 68-72.) According to Garcia, he only once recommended to Hernandez that an employee be fired for absenteeism and drinking, (Pls.' Garcia Dep., at 88:4-8), but Hernandez did not clearly act upon the recommendation. (*Id.* at 92:6-19.)[4] Eventually, this employee quit of his own accord. (*Id.* at

---

[2] With regard to Mr. Onesimo, the record is unclear as to whether Garcia merely made a recommendation to Hernandez about hiring Onesimo or hired him himself. (Pls.' Garcia Dep., at 87:18-23 ("Q: When you called [Onesimo], had you already spoken to Edgar about hiring him back *or* did you do it by yourself? A: Yes, I told him that they were looking for people at the company to come and speak with Edgar Hernandez.") (emphasis added).)

[3] Of these purported hires, Defendants provide affidavits from only Diaz, Tecum, and Perez corroborating that Garcia hired them, and Garcia contests their validity. (Garcia Decl. ¶ 19.)

[4] Defendants claim Garcia fired another worker, Mr. Minchaca, (*see* Defs.' 66.1 Stmt., ¶¶ 81-85), but Garcia contends he only fired Minchaca after Hernandez told him to do so. (Garcia Decl., ¶ 24.)

92:22-23.) While Garcia felt other employees should have been terminated, he stopped sharing this information with Hernandez because he believed Hernandez would not listen. (*Id.* at 96:2-9.)

### B. Plaintiff Farciert

In June 2009, DHR Restaurant Co., LLC hired Farciert on a salaried basis, (Pls.' Farciert Dep., at 75:5-8), as a sous chef "to help [Executive Chef Hernandez] supervise . . . the kitchen in Rare [Lexington]." (*Id.* at 23:1-5.) He conceptualized his primary duty as being "the helper of Chef Edgar," (Pls.' Farciert Dep., at 99: 22), which meant that his "main responsibility was to do whatever needed to be done" for the kitchen to run properly. (*Id.* at 101:11-16.) He did not recall having to clock in or out, making him a salaried employee. (*See id.* at 74: 12-15.)

Farciert concedes that in his second year of employment, his "supervisory duties increased" when Rare Chelsea opened, (Opp'n at 5; Velez Decl. ¶ 9), because when Hernandez was not at Rare Lexington, Farciert would "be the person running the place." (Pls.' Farciert Dep., at 90: 5-8; Defs.' Farciert Dep., at 43:2-3.)

Throughout Farciert's tenure at Rare, all of his duties and responsibilities stayed the same. (Pls.' Farciert Dep., at 29: 16-19; Defs.' Farciert Dep., at 110:9-11.) However, Plaintiff Farciert explained he had different "work" and "supervisory" responsibilities. (Defs.' Farciert Dep. in Supp. of Reply, ECF No. 76-1, at 109: 22-110: 11.)

His supervisory responsibilities included ordering ingredients, "mak[ing] sure that everything was prepared, [and] mak[ing] sure that the cleaning was done." (Defs.' Farciert Dep., at 59: 3-9; 97:23-98:1.) Farciert ensured that dishes were "expedited," or sent to diners, at an appropriate pace. (Pls.' Farciert Dep., at 96:22-97:2.) Farciert also ensured that employees prepared dishes in accordance with the company's standards on a day-to-day basis. (*Id.*, at 96:22-

97:2, 106:21-10:1.)  Toward the end of his tenure at Rare Lexington, Farciert would propose ideas for specials.  (*Id.*, at 108: 10-15.)

Farciert also interviewed candidates and reported his hiring recommendations to Hernandez.  (*See* Opp'n at 6.)  "When [Hernandez] wasn't there, [prospective workers] would talk to me first. I would call Hernandez and then they would come and he would say, okay . . . ." (Pls.' Farciert Dep., at 66:7-13.)  For example, Farciert recommended his father as a prep cook, (*id.* at 36: 14-17) and Bernabe Ramirez, as a sauté cook.  (Defs.' Farciert Dep., at 38: 13-14; 39:11-14.) Hernandez hired both. (*Id.*)  Farciert recommended to Hernandez several other kitchen employees, including Cesar Cruz, Obet Ramirez, Fidencio Cuapio, Rodolfo Pena Martinez, Rubin Pena, and Gil Merino.    (*See* Pls.' Farciert Dep., at 40: 8-10, 42:12-14, 117:2-119:8, 120:8-121:25.) Hernandez approved all of these candidates, and Pena Martinez, Pena, and Merino started work before ever meeting Hernandez. (*See id.* at 117: 14-25, 127:3-12, 128:14-21; Defs.' 56.1 Stmt. ¶ 62.)

Defendants admit they have no records of Farciert firing any employees at the restaurant. (Opp'n at 8 (citing Defs.' Responses to RFAs Nos. 13-15, Ex. G to Norinsberg Decl., ECF No. 63-7, at 5-6).)  However, when Farciert reported to Hernandez a fist fight between Fernando Baten and Obet Ramirez, Hernandez told Farciert to terminate Baten.  (Pls.' Farciert Dep., at 123:13-14; 126:2-8.)

At least once, Farciert conditionally approved an employee's request for vacation time. (Opp'n at 8.)  However, Hernandez revoked two weeks from that employee's three-week vacation request.  (*Id.*; *see* Hernandez Dep. Tr., at 53:15-54:24.)

Farciert testified that he did not perform certain classical management activities.   For instance, he did not manage kitchen equipment repairs.  (*Id.*, at 104:6-22.)  "Hernandez set up

standard procedures for how the kitchen should operate, including but not limited to, employee schedules, menus, orders, and cleaning." (Farciert Decl. ¶ 14.) Farciert did not set work schedules for other employees, (Pls.' Farciert Dep., at 104: 23-105:13), or regularly fill out any paperwork regarding employee performance. (Defs.' Farciert Dep., at 110:23-111:24.)

As to non-supervisory responsibilities, Farciert stated that he typically worked the grill about once a week and could not multitask while doing so. (Farciert Decl. ¶ 5; *see also* Velez Decl. ¶ 10). When asked to estimate if he spent less than half of his time cooking, he stated "sometimes; sometimes not." (Pls.' Farciert Dep., at 102: 2.) Plaintiff Farciert further testified at his deposition that both cooking and ensuring that the kitchen ran properly were his primary duties or responsibilities. (*Id.* at 101: 1-16).

## II. LEGAL STANDARD

Summary judgment is appropriate where the record establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996); *see also Williams v. McAllister Bros., Inc.,* 534 F.2d 19, 21 (2d Cir. 1976).

To defeat a motion for summary judgment, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based

upon 'concrete particulars,' not conclusory allegations.  To the extent that these affidavits contain

bald assertions and legal conclusions . . . the district court [can] properly refuse[ ] to rely on them."

*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citations omitted).

### III. APPLICABILITY OF FLSA AND NYLL EXECUTIVE EXEMPTIONS

Defendants argue that Plaintiffs, as head chefs, were employed in a managerial capacity,

which exempts them as executives from relief under the FLSA and NYLL overtime wage and

spread of hours provisions, 29 U.S.C. §§ 207(a)(1), 216(b); N.Y. Labor L. §§ 2, 651, 663(1).  (*See*

Mem. at 1, 25.)  This Court addresses Defendant's motion as it applies to each Plaintiff in turn.

Section 7(a)(1) of the FLSA provides that an employee who works in excess of forty hours

a week must receive compensation for "employment in excess of the hours above specified at a

rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. §

207(a)(1).  However, § 7(a)(1) does not apply to "any employee employed in a bona fide executive

. . . capacity."[5]  29 U.S.C. § 213(a)(1).  "The FLSA does not define 'bona fide executive . . . '

employment, and instead directs the Secretary of Labor to 'define and delimit' those terms 'from

time to time by regulations.'" *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 559 (2d Cir.

2012) (quoting 29 U.S.C. § 213(a)(1)).

The Department of Labor's regulations define "employee employed in a bona fide

executive capacity" as one:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of
> board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is
> employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and

---

[5] The NYLL has a substantially similar overtime provision with an analogous exception for executives. *See*
N.Y. Labor L. § 651(5)(c).

(4) Who has the authority to hire or fire other employees or whose suggestions and
recommendations as to the hiring, firing, advancement, promotion or any other change of
status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

The Second Circuit instructs courts to construe such exemptions narrowly "because the

FLSA is a remedial act . . . ." *See Ramos*, 687 F.3d at 558 (citing *Martin v. Malcolm Pirnie, Inc.*,

949 F.2d 611, 614 (2d Cir. 1991)). Accordingly, an "employer bears the burden of proving [by a

preponderance of the evidence] that its employees fall within an exempted category of the Act."

*Martin*, 949 F.2d at 614; *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir.

2002) (internal citation omitted).

The regulations also provide that "[a] job title alone is insufficient to establish the exempt

status of an employee." 29 C.F.R. § 541.2. Rather, "[t]he exemption question under the FLSA 'is

a mixed question of law and fact.'" *Ramos*, 687 F.3d at 558 (citing *Myers v. Hertz Corp.*, 624

F.3d 537, 548 (2d Cir. 2010) (internal quotation marks omitted)). How employees spent their

working time is a factual determination while "whether their particular activities excluded them

from the overtime benefits of the FLSA" is a legal question. *Id.* (quoting *Icicle Seafoods, Inc. v.

Worthington*, 475 U.S. 709, 714 (1986)).

The parties do not dispute the first and third prongs of executive exemption are satisfied.

(*See* Opp'n, at 11; Mem., at 12.) However, the parties disagree as to whether Plaintiffs' primary

duties were managerial (the second prong) and whether Plaintiffs had the authority to hire and fire

other employees (fourth prong). *See* 29 C.F.R. § 541.100(a).

### A. Primary Duty

"Primary duty" is defined by the regulations as "the principal, main, major or most

important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine whether a

plaintiff's performance of management[6] activities constitutes his "primary duty," a court must consider all the facts concerning "the character of an employee's job as a whole." *Id.* Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *See id.*

### 1. Relative importance of managerial work and relative salaries to non-exempt employees performing similar work

The relative importance inquiry evaluates whether the restaurants could not operate successfully unless the purported managerial functions assigned to each respective Head Chef, such as determining amounts of food to be prepared, keeping track of inventory, and assigning employees to particular jobs, were performed. *See Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982); *see also Scott v. SSP Am., Inc.*, No. 09-CV-4399, 2011 WL 1204406, at *9 (E.D.N.Y. Mar. 29, 2011). Because this is a "difficult and intensive factual inquiry," some courts have deemed a determination of relative importance "inappropriate at summary judgment." *See,*

---

[6] The regulations describe such classical "management" tasks as including, but not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; . . . providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Case 1:14-cv-09633-GBD   Document 82   Filed 02/03/17   Page 12 of 24

*e.g., Carhuapoma v. New York Presbyterian Healthcare Sys., Inc.*, No. 11 Civ. 8670, 2013 WL 1285295, *11 (S.D.N.Y. Mar. 29, 2013) (citing *Indergit v. Rite Aid. Corp.*, Nos. 08 Civ. 9361 and 08 Civ. 11364, 2010 WL 1327242, at *7 (Mar. 31, 2010 S.D.N.Y.) (citing cases)).

### 2.   Amount of time spent performing exempt work

The regulations provide that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."   29 C.F.R. § 541.700(b).  However, employees may still be exempt even if they "do not spend more than 50 percent of their time performing exempt duties . . . if the other factors support such a conclusion." *Id.*; *see Donovan.*, 675 F.2d at 521; *Scott*, 2011 WL 1204406, at *7 ("The time an employee spends performing exempt work is an important but non-determinative factor in determining an employee's primary duty.")

29 C.F.R. § 541.700(c) is particularly instructive:

> assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

### 3.   Employee's relative freedom from direct supervision[7]

Finally, when courts look at whether Plaintiffs' primary duties are exempt or non-exempt, they assess the employees' relative freedom from direct supervision. *See* 29 C.F.R. § 541.700(a). Courts in this District have found, for instance, that in light of "testimony that [plaintiffs] were

---

[7] This requirement is analogous to the NYLL requirement that Plaintiffs customarily and regularly exercised discretionary powers under NYLL.

12

specifically instructed by their supervisor to clean[,]" a jury could find that employees "did not, in fact, have discretion as to whether to perform such work." *Martinez v. Hilton Hotels Corp.*, 930 F Supp. 2d 508, 525 (S.D.N.Y. 2013).

The regulations contemplate that some exempt employees may concurrently perform exempt managerial work and nonexempt work. *See* 29 C.F.R. § 541.106.  Even while performing non-exempt work, an employee may still be an exempt executive if he "make[s] the decision regarding when to perform nonexempt duties and remain[s] responsible for the success or failure of business operations under their management . . . ." *Id.*  On the other hand,

> a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable.

*Id.* Thus, if an employee did non-exempt work 60% of the time, it does not necessarily follow that he spent the remaining 40% on exempt work.

### B.  Ability to Hire and Fire or Particular Weight Given to Recommendations

Under the fourth prong of the regulations, an employee must also have "the authority to hire or fire employees[,]" or must have his or her "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [be] given particular weight." 29 C.F.R. § 541.100(a)(4).  Factors this Court considers in its "particular weight" inquiry include:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105.  The fact that a higher level manager's recommendation may be more important or that an employee may not make the ultimate decision regarding another employee's

change in status does not preclude a finding that the employee's recommendation were given particular weight. *See id.* "If that were the case, . . . only one person in any given organization could ever be considered exempt within the meaning of the FLSA. Just because Plaintiffs' decisions could be . . . overridden . . . does not mean they were restricted or prohibited from making the decisions in the first place." *Nickell v. City of Lawrence, Kan.*, 352 F. Supp. 2d 1147, 1161 (D. Kan. 2004).

### C. Plaintiff Garcia is Not Shown to be Exempt as a Matter of Law

As to whether Garcia's primary duty was management, while the parties did not submit any documentation of a formal job description,[8] the parties do not dispute that Garcia did engage in some managerial functions. (Oral Arg. Tr., at 26:22-26:-27:7). These include management of ingredient inventory and quality (including reviewing, scheduling, and inspecting deliveries to ensure that food supplies were delivered on time and in proper quantities), (*see, e.g.,* Defs.' Garcia Tr., at 61: 16-25); overseeing the preparation of those ingredients prior to the kitchen opening for the day; and serving as quality control for the restaurant's cooking, (*see* Defs.' 56.1 Stmt. ¶¶ 31, 36-39, 40-46 (citing Boxer Decl. ¶ 34); Pls.' Garcia Tr. 62:11-15; 62:25-63:20). Garcia recommended a few candidates to Hernandez for various kitchen vacancies based on Garcia's interviews with those candidates and kept track of the various employment needs at Rare Chelsea. (*See, e.g.,* Pls.' Farciert Dep., at 36: 14-17, 40: 8-10, 42:12-14, 120:8-121:25; Garcia Dep., at 84:15-23.) Defendants further elicited that the only employee above Garcia was Hernandez.[9] (*See*

---

[8] However, Hernandez alluded to the existence of a manual in his deposition: "We sat down and we went over all the rules, all the procedures of the restaurant; there was a book of recipes, inventories, things that had [to] be followed a certain way . . . ." (Pls.' Hernandez Dep., at 61: 16-17.)

[9] Case law in this Circuit is clear that "employees do not become bona fide executives under [the] FLSA simply because there are employees lower than them in the company's hierarchy." *Indergit*, 2010 WL 1327242, at *7 (citing cases).

Defs. 56.1 Stmt. ¶¶ 5-6.) According to Boxer, Plaintiff participated in management meetings. *See Carreras v. Thierry's Inc.*, No. 14-21188-CIV, 2015 WL 3874801, at *1, *3 (S.D. Fla. June 23, 2015) (finding where plaintiff was one of three employees who attended management meetings, management was her primary duty); (Boxer Decl. 65-66). Thus, the parties' disagreement is a narrow one: whether the managerial functions Plaintiffs performed were "more important" than the non-managerial functions they performed. (Tr. at 32:17:25.)

As to the first factor of the primary duty prong of the executive exemption test, Defendants argue that Garcia's "most critical and important duty . . . is to make sure that all aspects of the Kitchen run smoothly, efficiently, and effectively." (Mem., at 15; Defs.' 56.1 Stmt., ¶ 118. Some deposition testimony from Garcia supports this. (Defs.' Garcia Tr., at 45:25-46:5 ("I needed to make sure that the restaurant was clean, that things go well, for the refrigerator to be organized, for the storage room to be organized, and for the delivery in the morning to get there well [sic].").) Hernandez's deposition testimony and declaration are also consistent with Defendants' contentions.

The record, however, taken in the light most favorable to Garcia, also supports Garcia's contention that his managerial duties were not necessarily the most important part of his jobs. For instance, other employees could have also performed some of his supervisory duties, rendering those duties less important. *See Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp.2d 285, 291 (E.D.N.Y. 2010); (Opp'n, at 15.) New employees usually received the bulk of their training from other employees at stations next to them, rather than from Garcia. (*See* Pls.' Garcia Dep., at 64:20-65:3.) Garcia also testified that line cooks would each "supervise their own station" at Rare Chelsea, (Pls.' Garcia Dep., at 75: 13-21), and that he had to run decisions by Hernandez via phone when Hernandez was not present. (*See* Pls.' Garcia Dep., at 79: 7-24.)

Garcia testified that he regularly covered cooking shifts whenever there was a need, and not necessarily by choice, indicating that his manual, non-exempt, labor was of significant value to Rare. *See Carhuapoma*, 2013 WL 1285295, at *12. According to him, he "was also the line cook," (Pls.' Garcia Dep., at 43: 17-23), and covered shifts for breakfast, lunch, and/or dinner, depending on need, including a breakfast shift for at least a year of his tenure. (*Id.* at 74:4-19). Garcia's testimony that his primary responsibility "was supervising and managing the kitchen on an overall basis to ensure that workers are doing what they are supposed to do and that food is prepared by company standards" only "when Chef Edgar Hernandez was not present," (Defs.' Garcia Tr., at 66:24-67:7), fits squarely into the example described by the regulations for a working supervisor that is not exempt under the FLSA. *See* 29 C.F.R. § 541.106(c) (describing a non-exempt employee who "occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable").

Plaintiff Garcia's average salary amounts to about $13.00 hourly, (*see* Opp'n, at 16; Ex. I to Norinsberg Decl., ECF No. 63-9), and he typically worked at least eighty hours a week. (Pls.' Hernandez Dep., at 43:8-10). The three non-exempt line cooks earned between $14 and $17.50 an hour. (*See id.*) Even a non-exempt line cook earning $14 an hour would earn more weekly than Garcia if he worked the same hours ($1,295 a week). With a weekly salary of $1,086, Garcia was paid much less than the non-exempt line cooks for doing mostly non-exempt work, suggesting that his value to Rare was for his non-exempt work.

The record therefore reflects that a factual issue remains as to the relative importance of Plaintiff Garcia's supervisory duties, as opposed to his non-exempt duties, to the employer and to the success of the restaurants. *See Carhuapoma*, 2013 WL 1285295, at *11-12 (denying summary judgment where performance reviews indicated that both plaintiff's managerial duties and manual

labor were of value to hospital).  In light of Defendants' burden to establish that Plaintiffs qualify for the executive exemption as a matter of law, Defendants may have overstated their claims regarding the relative importance of Plaintiff Garcia's exempt duties and have failed to cite to any controlling authority directly on point.  (*See* Mem. at 19-21.)

With regard to the percentage of time Garcia spent performing non-exempt work, the parties agree that Plaintiff Garcia performed non-exempt work from time to time.  (*See* Mem. at 19 ("To be sure, both Farciert and Garcia sometimes themselves prepared food in their respective kitchens."))  However, the record is notably absent of any affirmative explicit statements from either party with regard to the actual number of hours out of each day or even on a weekly basis that Plaintiffs spent performing exempt or non-exempt work.  (*See e.g.*, Defs.' Garcia Dep., at 98:12-23 ("I would spend more time at the restaurant [than Mr. Hernandez], I could see the person who was working . . . . .").)

Given Garcia's repeated assertions that he only supervised the kitchen when Hernandez was absent, the amount of time Hernandez spent at Rare Chelsea weighs heavily in this inquiry. Assuming, on average, that Hernandez split his time evenly between Rare Chelsea and Rare Lexington,  Plaintiff Garcia would be left alone "in charge" of the kitchen for at least 50% of their workweek.  (Defs.' 56.1 Stmt., ¶ ¶¶ 108-110 (citing Farciert Tr. 87:3-6, 88:23-89:6; Garcia Tr. 34:22-35:3; Hernandez Decl. ¶¶ 11-12).)  And, if Hernandez was handling catering events, he would be in the kitchen in each location ostensibly less than 50% of Garcia's work week. Consistent with these estimations, Hernandez states that he was not present in each Head Chef's kitchen 60% or more of the time.  (Hernandez Reply Decl. ¶¶ 5-6.)

However, the inquiry does not end with the percentage of time Hernandez was absent at Rare Chelsea, as Defendants would have it, because the regulations contemplate the concurrent

performance of exempt and non-exempt work. *See* 29 C.F.R. § 541.106; (Reply, ECF No. 73, at 4.) That Plaintiff Garcia offers evidence supporting that he performed non-exempt line cook duties for around seventy hours out of his eighty-hour workweek is not so contradictory as to discount his declarations and testimony, even if Hernandez was absent about 60% of the time. (*See* Reply, at 4 n.7 (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (discounting factual allegations made for the first time in support of a motion for summary judgment when they contradict deposition testimony).)

In particular, on days when Hernandez was in the kitchen, Plaintiff Garcia claimed to cook or perform prep work from about 6:00 a.m. to 4:00 p.m. (Defs.' Garcia Tr., at 68:5-6.) He further testified that, as he had to focus on cooking, he could not actively supervise other workers in the kitchen. (Pls.' Garcia Tr., at 74:20-76:12.) Taking the facts in the light most favorable to Garcia, and with the burden on Defendants to prove the exemption, cooking for ten hours a day in an eighty-hour week leads to an approximation that Garcia cooked for more than fifty percent of his work day. (*See supra*, n. 2.)

To the extent there are apparent inconsistencies as to how Plaintiff Garcia spent his time, the record demonstrates that his statements are not directly contradictory and appear to be the result of one-word answers to leading questions or misunderstanding across translation.[10] *See Jin Dong Wang v. LW Restaurant, Inc.*, 81 F. Supp. 3d 241, 255-256 (E.D.N.Y. 2015). This is not an "extraordinary case[]" in which "the facts alleged are so contradictory that doubt is cast upon their plausibility . . . ." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011). The record for Garcia is somewhat confusing and muddled with translation issues compounded by

---

[10] The record has several instances indicating Plaintiff Garcia had Spanish interpretation issues, including when the interpreter offered to rephrase Defendants' counsel's question. (*See, e.g.*, Pls.' Garcia Dep., at 90: 1-16; *see also* 33: 10-15 for indication of possible translation issues where Garcia stated "I was working three stations, which is breakfast, lunch and dinner. It was a very strong day for me.".

strategically-worded leading questions. *See id.* 261 n.15. Credibility assessments would involve the kind of "searching, skeptical analyses of parties' testimony in opposition to summary judgment" against which the Second Circuit has cautioned. *See Rojas*, 660 F.3d at 106.

As to whether Garcia had relative freedom from direct supervision (the last factor of the primary duty prong), Defendants contend that Garcia "direct[ed] the work of kitchen staff as they deemed appropriate, order[ed] food based on their independent determinations as to how much was needed, and us[ed] their discretion to expedite orders as appropriate." (Mem. at 24.) However, Garcia has testified that many of his day-to-day decisions involved Hernandez' direction. (Opp'n at 18.) Hernandez set schedules for the employees in the kitchen and developed the food preparation procedures that Plaintiffs followed. (*See* Opp'n at 17.) Garcia said, "If there was an important decision to be done, we couldn't do it until we contacted him." (Pls.' Garcia Dep., at 27:5-13; *see also id.* at 90-91.) When Rare Chelsea opened, Garcia said Hernandez spent at least 60% of his time there, managing him. (Defs.' 56.1 Stmt. ¶ 109.) Plaintiff Garcia's situation, therefore, appears similar to the plaintiff in *Stevens v. HMSHost Corp.*, No. 10-CV-3571, 2015 WL 4645742, at *5 (Aug. 5, 2015 E.D.N.Y.), who testified that instead of being able to freely make decisions, "[Y]ou have to ask. Always." *Id.*

Coupled with the material disputes of fact regarding the extent to which Garcia's exempt duties were more important than his non-exempt duties, as well as the percentage of time he spent performing exempt duties, this Court cannot state as a matter of law that Garcia regularly made "decisions of the kind and quality normally made by person formulating policy within [his] spheres of responsibility." *See Clougher*, 696 F. Supp. 2d at 291. Indeed, the regulations provide that "an employee whose primary duty is to work as an electrician is not an exempt executive even if the

employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor." 29 C.F.R. § 541.106.

The fourth prong of the executive exemption test examines whether the record supports Defendants' contention that that Plaintiff Garcia's personnel recommendations were given particular weight by Hernandez. (Mem. at 22.) Plaintiff Garcia testified that he "made recommendations to Hernandez" regarding the hiring of Edgar Diaz and a Mr. Onesimo.[11] (Pls.' Garcia Dep., at 82:23-84:23.) Defendants corroborate Mr. Diaz' hire and provide additional affidavits from Miguel Tecum and Leonides Perez stating that Garcia "hired" them.[12] (*See* Defs. 56.1 Stmt. ¶¶ 68-72.) Garcia also testified that he passed along informal feedback to Hernandez regarding others because "[he] would spend more time at the restaurant [than Mr. Hernandez], [and he] could see the person who was working." (Defs.' Garcia Dep., at 98:12-23.) Garcia believed it was part of his job responsibilities to provide Hernandez with feedback on the kitchen workers, and referenced a particular case in which he recommended a dishwasher for a pay raise. (Pls.' Garcia Dep., at 97:20-98:23.) While Garcia testified that Hernandez ultimately made decisions regarding the termination of two different employees and often did not listen to Garcia's suggestions, (*id.* at 96:2-9), the record as a whole reflects that Hernandez gave particular weight to Garcia's recommendations regarding the hiring at least two to four kitchen personnel.

---

[11] With regard to Mr. Onesimo, the record is unclear as to whether Garcia merely made a recommendation to Hernandez about hiring Onesimo or hired him himself. (Pls.' Garcia Dep., at 87:18-23 ("Q: When you called [Onesimo], had you already spoken to Edgar about hiring him back *or* did you do it by yourself? A: Yes, I told him that they were looking for people at the company to come and speak with Edgar Hernandez.") (emphasis added).)

[12] This Court notes that Defendants also claim that Garcia hired Margarito Romero, Alfonso Chino, Roberto Chino, Jorge Pinto, Javier Golvez, Santiago Jimenez, and Fidel Manzano, but did not submit any affidavits from them.

Although Defendants have established there exist no genuine issue of material fact as to the fourth prong of the executive exemption test, there exist genuine issues of material fact regarding whether Garcia's primary duties were managerial in nature. Therefore, Defendants have failed to carry their burden to establish that Garcia is exempt under the FLSA.

### D.  The Executive Exemption Applies to Plaintiff Farciert

Applying the same laws to Plaintiff Farciert's facts, this Court comes to the opposite conclusion. On this record, there is no genuine issue of material fact that Farciert was an exempt employee of Rare Lexington.

The parties do not dispute that Farciert engaged in some managerial functions. (Oral Arg. Tr., at 26:22-26:-27:7). He managed ingredient inventory and quality (including reviewing, scheduling, oversaw the preparation of those ingredients prior to the kitchen opening for the day; and serving as quality control for the restaurant's cooking, (*see* Defs.' 56.1 Stmt. ¶¶ 31, 36-39, 40-46 (citing Boxer Decl. ¶ 34); Defs.' Farciert Tr. 58:24-59:12, 98:14-99:4, 102:24-103:13, 104:2-5)). Farciert also testified that he recommended candidates to Hernandez for various kitchen vacancies based on his own interviews with those candidates, and some of those candidates started work without ever meeting Hernandez. (*See, e.g.*, Pls.' Farciert Dep., at 36: 14-17, 40: 8-10, 42:12-14, 120:8-121:25.) Defendants further elicited testimony from Farciert that the only employee above him was Hernandez. (*See* Defs. 56.1 Stmt. ¶¶ 5-6.) Boxer testified that Farciert also participated in management meetings. *See Carreras v. Thierry's Inc.*, No. 14-21188-CIV, 2015 WL 3874801, at *1, *3 (S.D. Fla. June 23, 2015) (finding where plaintiff was one of three employees who attended management meetings, management was her primary duty); (Boxer Decl. 65-66). Defendants argue that both Plaintiffs' "most critical and important duty . . . is to make sure that all aspects of the Kitchen run smoothly, efficiently, and effectively." (Mem., at 15; Defs.'

56.1 Stmt., ¶ 118; Defs.' Farciert Tr., at 101:11-16 ("Q: And I thought I understood you to say that your primary or main responsibility was to do whatever needed to be done in order to ensure that the kitchen was running properly?  A: Yeah, that was my responsibility, yes.").)  Although some testimony establishes that other employees performed some of Farciert's managerial duties, like Edwin Vidales, who generally handled receiving orders at Rare Lexington, (Farciert Decl. ¶ 10), the record is clear that Farciert's management duties were very important to Rare Lexington. (*See* Pls. Farciert Dep., at 106: 6-20.)

Farciert testified that he regularly covered cooking shifts whenever there was a need, and not necessarily by choice. *See Carhuapoma*, 2013 WL 1285295, at *12.  But, the record lacks critical details including how often Farciert would cover, or the length of, such shifts. (Pls.' Farciert Dep., at 102: 2 (stating merely that he "sometimes, sometimes not" spent half his time cooking).) Having discretion in the type of non-exempt work he performed weighs in favor of finding that his exempt duties were more important.  29 C.F.R. § 541.106(a) ("[E]xempt executives make the decision regarding when to perform nonexempt duties."); (*see* Pls.' Farciert Dep., at 102: 3-23 (stating he preferred the grill station to sautéing)).

As to the percentage of time spent performing exempt work versus non-exempt work, Farciert's former colleague, Victor Velez's testimony corroborated that Plaintiff "sometimes" spent half his time cooking.  (Decl. of Victor Velez in Opp'n to Mot. for Summ. J. ("Velez Decl."), ECF No. 67, ¶ 10 (stating Farciert "continue[d] to cook whenever needed, approximately once a week.").)  Farciert's infrequent time at the grill therefore also tips in favor of finding his exempt duties were more important than his non-exempt ones. *See id.*

With regard to Farciert's freedom from supervision, he contends that Hernandez provided close supervision.  When Defendants first hired Farciert, he and Hernandez "sat down and went

over all the rules, all the procedures of the restaurant . . . things that had to be followed a certain way." (Hernandez Dep., at 16: 15-18.)  Any vacation requests or day-of staffing absences required Hernandez's direction to call substitutes to step in.  (*See* Farciert Dep. at 94:15-95:8, 105:7-19).  Farciert claims he did not "make the decision regarding when to perform nonexempt duties."  *See* 29 C.F.R. § 541.106(a); *Martinez*. 930 F Supp. 2d at 525.  However, this apparent lack of discretion is not dispositive because the factors, taken together, support a conclusion that management was Farciert's primary duty.  *See Donovan,* 675 F.2d at 521–22 ("[A]n employee can be exempt even if his discretion is 'circumscribed' by a guidebook or supervisor, as long as, despite the circumscription, 'judgments must still be made' by that employee.").  Farciert made such judgments, including proposing ideas for daily specials.  (*See, e.g.*, Pls.' Farciert Dep., at 104:6-22.)

Finally, as to the fourth prong of the executive exemption test, *see* 29 C.F.R. § 541.100(a), the record supports Defendants' contention that Hernandez gave particular weight to Farciert's personnel recommendations.  (*See* Mem. at 22.)   Specifically, Farciert testified, "When [Hernandez] wasn't there, [prospective workers] would talk to me first.  I would call Hernandez and then they would come and he would say, okay . . . ." (Pls.' Farciert Dep., at 66:7-13.)  Farciert passed on to Hernandez information regarding prospective applicants, (*id.* at 67:10-19), including his own father and Bernabe Ramirez, (Pls.' Farciert Dep., at 36: 14-17; Defs.' Farciert Dep., at 38: 13-14; 39:11-14), as well as Cesar Cruz, Obet Ramirez, Fidencio Cuapio, Rodolfo Pena Martinez, Rubin Pena, and Gill Merino, (*see* Pls.' Farciert Dep., at 40: 8-10, 42:12-14, 117:2-119:8, 120:8-121:25, 127:3-12).   After Farciert consulted Hernandez regarding their hiring, Hernandez approved all of these candidates.  (*See* Opp'n at 6.)  Indeed, Merino, Pena Martinez, and Pena started work before ever meeting Hernandez.  (*See* Defs.' 56.1 Stmt. ¶ 62; Pls.' Farciert Dep. at

117: 14-25; 128:14-21.)   While Defendants admit they have no records of Farciert firing any employees at the restaurant, (Opp'n at 8 (citing Defs.' Responses to RFAs Nos. 13-15, Ex. G to Norinsberg Decl., ECF No. 63-7, at 5-6)), the record as a whole supports Defendants' contention that Hernandez gave Farciert's personnel recommendations particular weight, even if he did not always act in accordance with Farciert's recommendations.

Accordingly, on this record, there exists no genuine issue of material fact regarding Farciert's exempt status.

## IV. CONCLUSION

When viewed in the light most favorable to Plaintiff Garcia, there is a genuine issue of material fact with regard to his exempt status under the FLSA.  Taking into consideration all of the regulatory factors as a whole, *see* 29 C.F.R. § 541.700(a), there remain material questions of fact as to whether management of the enterprise was indeed Plaintiff Garcia's primary duty.  *See* 29 C.F.R. § 541.100(a)(1).  As Defendants have failed to carry the burden of affirmatively proving Plaintiff Garcia is an exempt executive, *see Martin*, 949 F.2d at 614, the motion for summary judgment is therefore DENIED as to Plaintiff Garcia.

As to Plaintiff Farciert, even when viewed in the light most favorable to him, the record supports a finding that Defendants have met their burden as to both prongs of the executive exemption test at issue.  Defendants' motion is therefore GRANTED as to Plaintiff Farciert.

This Order resolves the motion at ECF No. 47.


Dated: New York, New York           SO ORDERED.
      February 3, 2017

                                      GEORGE B. DANIELS
                                      United States District Judge